UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| HARRY A. BACAS, Derivatively on Behalf of HCC INSURANCE HOLDINGS, INC., | § § § | Civil Action No. |
| Plaintiff, | § § § | |
| vs. | § § | |
| STEPHEN L. WAY, FRANK J. BRAMANTI, EDWARD H. ELLIS, JR., JOHN N. MOLBECK, JR., CHRISTOPHER L. MARTIN, BARRY J. COOK, CRAIG J. KELBEL, FARID F. NAGJI, MICHAEL J. SCHELL, ROBERT F. THOMAS, PAMELA J. PENNY, PATRICK B. COLLINS, JAMES R. CRANE, J. ROBERT DICKERSON, WALTER M. DUER, JAMES C. FLAGG, ALLAN W. FULKERSON, WALTER J. LACK, MICHAEL A. F. ROBERTS and MARVIN P. BUSH, | § § § § § § § § § § § § § § § § | |
| Defendants, | § § | |
| – and – | § § | |
| HCC INSURANCE HOLDINGS, INC., a Delaware corporation, | § § § | |
| Nominal Defendant. | § § § | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, GROSS MISMANAGEMENT, CONSTRUCTIVE FRAUD, UNJUST ENRICHMENT, BREACH OF CONTRACT AND FOR AN ACCOUNTING**

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of HCC Insurance Holdings, Inc. ("HCC" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants"). This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior HCC insiders to divert hundreds of millions of dollars of corporate assets to themselves and other employees via the manipulation of grant dates associated with hundreds of thousands of stock options granted to HCC insiders. Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to corporate employees from 1995 to 2006.

2. Between 1995 and 2006, Defendants also caused HCC to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by HCC carried with them an exercise price that was *not less than* the fair market value of HCC stock on the date of grant and issuance.

3. In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be *backdated* to dates when the Company's shares were trading at or near the lowest price for that relevant period. By August 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars. These grants were included in more than $183.2 million in stock sale proceeds for Defendants.

4. Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Texas and Delaware law. By

- 1 -

authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused HCC to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior HCC executives; and (iii) subjected HCC to potential liability from regulators including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed HCC and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed HCC to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of HCC's earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on HCC.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans.  The Company has now been mentioned as one of several companies likely to have manipulated options.  Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding HCC's internal control problems, abused their fiduciary relationship with the Company by selling over $183.2 million worth of their personally held shares at artificially inflated prices during the relevant period.  This action seeks recovery for HCC against

these faithless fiduciaries, as HCC's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under Texas and Delaware law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. HCC is located in and conducts its business in this District. Further, Defendants conduct business in this District, and certain of the Defendants are citizens of Texas and reside in this District.

## PARTIES

11.     Plaintiff Harry A. Bacas, is a shareholder of HCC, and holds and has continually held HCC stock since 1997.

12.     Nominal party HCC provides property and casualty, surety, group life, and accident and health insurance products and related agency and reinsurance brokerage services in the United States, the United Kingdom, Spain, Ireland and Bermuda.  HCC is a Delaware corporation with its principal executive offices located at 13403 Northwest Freeway, Houston, Texas.

13.     Defendant Stephen L. Way ("Way") founded HCC in 1974 and served as a director, Chairman of the Board and Chief Executive Officer ("CEO") of the Company from its inception until his resignation on November 17, 2006.  Defendant Way remains with the Company on a consulting basis and as non-executive Chairman of the Board.  Additionally, Way served as President of HCC from 1974 to 1996 and from 2002 to March 2006.  Because of Way's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Way participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Way sold 5.2 million shares of HCC stock for proceeds of $119.5 million during the relevant period.  Defendant Way may be served at 10 East Bend Lane, Houston, Texas 77007.

14.     Defendant Frank J. Bramanti ("Bramanti") has served as a director of HCC since 1980 and as CEO since November 17, 2006.  Previously, Bramanti served in various capacities, including Interim President, Executive Vice President, Chief Financial Officer ("CFO") and Secretary of HCC from 1980 to 2001.  Because of Bramanti's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Bramanti, by his specialized financial expertise, was in a unique position to understand the business of HCC as well as its finances, markets and present and future business prospects. During the relevant period, Bramanti participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Bramanti sold 1.17 million shares of HCC stock for proceeds of $20.5 million during the relevant period. Defendant Bramanti may be served at 13403 Northwest Freeway, Houston, Texas 77040.

15.     Defendant Edward H. Ellis, Jr. ("Ellis") has been a director of HCC since 2001, and CFO and Executive Vice President of HCC since 1997. Because of Ellis's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Ellis, by his specialized financial expertise, was in a unique position to understand the business of HCC as well as its finances, markets and present and future business prospects. During the relevant period, Ellis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Ellis sold 255,000 shares of HCC stock for proceeds of $5.3 million during the relevant period. Defendant Ellis may be served at 13403 Northwest Freeway, Houston, Texas 77040.

16.     Defendant John N. Molbeck, Jr. ("Molbeck") has served as a director of HCC since 1997 and as President and Chief Operating Officer ("COO") since March 2006. Additionally,

Molbeck served as President and COO of the Company from 1997 to 2002. Because of Molbeck's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Molbeck participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Molbeck sold 490,998 shares of HCC stock for proceeds of $8.2 million during the relevant period. Defendant Molbeck may be served at 13403 Northwest Freeway, Houston, Texas 77040.

17.     Defendant Christopher L. Martin ("Martin") was Executive Vice President, General Counsel and Secretary of HCC from 1997 until his resignation on November 17, 2006. Because of Martin's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Martin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Martin sold 151,206 shares of HCC stock for proceeds of $3.5 million during the relevant period. Defendant Martin may be served at 4505 Holt Street, Bellaire, Texas 77401.

- 6 -

18.     Defendant Barry J. Cook ("Cook") has served as Executive Vice President of HCC and CEO of HCC Insurance Holdings International Limited, a division of HCC, since 2005. Defendant Cook may be served at 13403 Northwest Freeway, Houston, Texas 77040.

19.     Defendant Craig J. Kelbel ("Kelbel ") has been Executive Vice President of HCC and President and CEO of HCC Life Insurance Company, a division of HCC, since 1999. Because of Kelbel's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Kelbel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Kelbel sold 187,500 shares of HCC stock for proceeds of \$4.3 million during the relevant period. Defendant Kelbel may be served at 13403 Northwest Freeway, Houston, Texas 77040.

20.     Defendant Farid F. Nagji ("Nagji") has been Executive Vice President, Administration and Corporate Services of HCC since March 2006. Previously, Nagji served as Senior Vice President and Chief Information Officer of the Company from 2003 to June 2005, and Senior Vice President, Office of the Chairman of HCC from June 2005 to March 2006. Because of Nagji's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Nagji participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

- 7 -

Based on his knowledge of material non-public information regarding the Company, defendant Nagji sold 12,000 shares of HCC stock for proceeds of $385,800 during the relevant period. Defendant Nagji may be served at 13403 Northwest Freeway, Houston, Texas 77040.

21.     Defendant Michael J. Schell ("Schell") has been Executive Vice President of HCC since 2002. Because of Schell's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Schell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Schell sold 150,000 shares of HCC stock for proceeds of $4.3 million during the relevant period. Defendant Schell may be served at 13403 Northwest Freeway, Houston, Texas 77040.

22.     Defendant Robert F. Thomas ("Thomas") has been Executive Vice President of HCC since 2004. Because of Thomas's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Thomas participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Thomas may be served at 13403 Northwest Freeway, Houston, Texas 77040.

- 8 -

23. Defendant Pamela J. Penny ("Penny") has been Senior Vice President, Finance of HCC since 2004. Because of Penny's position, she knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. Defendant Penny, by her specialized financial expertise, was in a unique position to understand the business of HCC as well as its finances, markets and present and future business prospects. During the relevant period, Penny participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Penny may be served at 13403 Northwest Freeway, Houston, Texas 77040.

24. Defendant Patrick B. Collins ("Collins") has been a director of HCC since 1993. Because of Collins' position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Audit Committee, defendant Collins caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Collins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Collins sold 75,000 shares of HCC stock for proceeds of $1.4 million during the relevant period. Defendant Collins may be served at 14018 Taylorcrest Road, Houston, Texas 77079.

25. Defendant James R. Crane ("Crane") has been a director of HCC since 1999. Because of Crane's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Nominating & Corporate Governance Committee, defendant Crane caused or allowed the dissemination of the improper public statements described herein. As a member of the Compensation Committee, defendant Crane controlled the other Defendants' stock option awards. During the relevant period, Crane participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Crane sold 155,000 shares of HCC stock for proceeds of $3.1 million during the relevant period. Defendant Crane may be served at 1702 North Blvd., Houston, Texas 77079.

26. Defendant J. Robert Dickerson ("Dickerson") has been a director of HCC since 1981. Because of Dickerson's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Nominating & Corporate Governance Committee, defendant Dickerson caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Dickerson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public

- 10 -

information regarding the Company, defendant Dickerson sold 67,750 shares of HCC stock for proceeds of $1.3 million during the relevant period. Defendant Dickerson may be served at 6110 Pebble Beach Drive, Houston, Texas 77069.

27. Defendant Walter M. Duer ("Duer") has been a director of HCC since 2004. Because of Duer's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Audit Committee, defendant Duer caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Duer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Duer may be served at 3707 Chevy Chase Drive, Houston, Texas 77019 .

28. Defendant James C. Flagg ("Flagg") has been a director of HCC since 2001. Because of Flagg's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Audit Committee, defendant Flagg allowed the dissemination of the improper public statements described herein. During the relevant period, Flagg participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Flagg sold 32,500 shares of HCC stock for

- 11 -

proceeds of $1.2 million during the relevant period. Defendant Flagg may be served at 5707 Paint Trail, College Station, Texas 77845.

29. Defendant Allan W. Fulkerson ("Fulkerson") has been a director of HCC since 1997. Because of Fulkerson's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Fulkerson is a member (Chair) of the Investment Committee. During the relevant period, Fulkerson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Fulkerson sold 57,750 shares of HCC stock for proceeds of $2 million during the relevant period. Defendant Fulkerson may be served at 900 Snowberry Lane, Sanibel, Florida 33957.

30. Defendant Walker J. Lack ("Lack") was a director of HCC from 1981 to November 8, 2006. Because of Lack's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Nominating & Corporate Governance Committee, defendant Lack allowed the dissemination of false statements alleged herein. As a member (Chair) of the Compensation Committee, defendant Lack controlled the other Defendants' stock option awards. Defendant Lack was the designated Lead Independent Director of the Company's Board. During the relevant period, Lack participated in the issuance of false and/or

- 12 -

misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Lack sold 273,125 shares of HCC stock for proceeds of $5.4 million during the relevant period.  Defendant Lack may be served at 17069 Oakview Drive, Encino, California 91436.

31.     Defendant Michael A. F. Roberts ("Roberts") has been a director of HCC since 2002. Because of Roberts' position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating & Corporate Governance Committee, defendant Roberts allowed the dissemination of false statements alleged herein.  As a member of the Compensation Committee, defendant Roberts controlled the other Defendants' stock option awards. Defendant Roberts is a member of the Investment Committee. During the relevant period, Roberts participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Roberts may be served at 73 Apple Tree Lane, New Canaan, Connecticut 06840.

32.     Defendant Marvin P. Bush ("Bush") was a director of HCC from 1999 until 2002, when he became an advisory director.  Because of Bush's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Bush is a member of the Investment Committee.  During the relevant period, Bush participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press

releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Bush sold 93,000 shares of HCC stock for proceeds of $2.2 million during the relevant period. Defendant Bush may be served at 6202 Fort Hunt Road, Alexandria, Virginia 22307.

33. The defendants identified in ¶¶13-16, 24-29 and 31 are referred to herein as the "Director Defendants." The defendants identified in ¶¶14-23 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-17, 19-21, 24-26, 28, 30 and 32 are referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

34. Each officer and director of HCC named herein owed the Company and HCC shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of HCC's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of HCC. Further, the misconduct of HCC's officers has been ratified by HCC's Board, which has failed to take any legal action on behalf of the Company against them.

35. By reason of their positions as officers, directors and fiduciaries of HCC and because of their ability to control the business and corporate affairs of the Company, the Defendants owed HCC and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage HCC in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of HCC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over HCC to divert assets to themselves via improper and/or unlawful practices. Defendants also

- 14 -

had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

36.     Because of their positions of control and authority as directors or officers of HCC, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause HCC to disseminate false Proxy Statements for 1995-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with HCC, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to HCC shareholders and the financial markets but failed to do so.

37.     Between 1995 and 2006, Defendants concealed that the stock option grants had been repeatedly and consciously *backdated* to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period. Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company. In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants from as early as 1995 to 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

38.     To discharge their duties, the directors of HCC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and

- 15 -

financial affairs of HCC. By virtue of such duties, the officers and directors of HCC were required, among other things, to:

(a) manage, conduct, supervise and direct the business affairs of HCC in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of HCC);

(b) neither engage in self-dealing nor knowingly permit any officer, director or employee of HCC to engage in self-dealing;

(c) neither violate nor knowingly permit any officer, director or employee of HCC to violate applicable laws, rules and regulations;

(d) remain informed as to the status of HCC's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e) prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f) establish and maintain systematic and accurate records and reports of the business and affairs of HCC and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

- 16 -

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that HCC's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in HCC stock by the officers and employees of HCC; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from HCC and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of HCC and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

39.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of HCC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised HCC's entire Board during the relevant period.

40.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. As a result,

- 17 -

HCC has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

        (a)      improvidently paid executive compensation;

        (b)      increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

        (c)      costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

        (d)      incurring possible IRS penalties for improperly reporting compensation.

41.      These actions have irreparably damaged HCC's corporate image and goodwill. For at least the foreseeable future, HCC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that HCC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

42.      In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

43.      During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to HCC insiders and directors and causing HCC to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at HCC and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of HCC, regarding Defendants' compensation practices and HCC's financial performance.

44.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of HCC common stock so they could dispose of millions of dollars of their own HCC stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

45.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent HCC's financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

46.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

47.     HCC provides property and casualty, surety, group life, and accident and health insurance products and related agency and reinsurance brokerage services in the United States, the United Kingdom, Spain, Ireland and Bermuda. It provides insurance and/or reinsurance underwriting services in the lines of business, including diversified financial products, such as directors' and officers' liability, professional indemnity, employment practices liability and surety; group life, accident, and health; aviation; London market account, including energy, marine,

- 19 -

property, and accident and health; and other specialty lines of insurance. The Company markets its products directly to customers, as well as through a network of independent and affiliated brokers, producers and agents. The Company was founded in 1974 and is headquartered in Houston, Texas.

48. Throughout the relevant period, Defendants caused HCC to grant them millions of stock options permitting them to buy HCC stock for pennies on the dollar which they could in turn sell as the Company's stock price increased. A stock option gives the holder the right to buy a stock at a certain price in the future. Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

49. However, many of the millions of options granted to HCC's executives had a hidden, valuable component: they were misdated, often making them even more significantly valuable. The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

50. Complicating matters and magnifying the harm to HCC, during the relevant period, HCC's internal controls and accounting controls with respect to option grants and exercises, and its

- 20 -

financial reporting, were grossly inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated. They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

51.     Specifically, in many instances the reported dates HCC stock options were granted differed from the dates on which the options appear to have been actually granted. The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

52.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to HCC a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the problems HCC faced because of its deficient internal controls. Furthermore, the Defendants who were members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies. Defendants, as directors or officers of HCC, had ample opportunity to discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of

the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by HCC to the investing public and the Company's shareholders during the relevant period.

53.    Specifically, since at least 1995, Defendants have caused HCC to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR | REPORTED EARNINGS (LOSS) (in millions) |
|---|---|
| 1995 | $24.34 |
| 1996 | $38.53 |
| 1997 | $49.76 |
| 1998 | $72.28 |
| 1999 | $25.12 |
| 2000 | $55.47 |
| 2001 | $30.20 |
| 2002 | $105.83 |
| 2003 | $143.56 |
| 2004 | $163.03 |
| 2005 | $195.86 |

54.    Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated. The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period. In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

55.    Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $183.2 million worth of HCC stock – stock they obtained often by cashing in under-priced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| WAY | 11/14/00-03/31/06 | 5,254,067 | $119,521,957 |
| BRAMANTI | 08/14/00-10/16/01 | 1,177,583 | $20,567,555 |
| ELLIS | 11/30/00-05/10/05 | 255,000 | $5,383,025 |
| MOLBECK | 11/13/00-01/02/02 | 490,998 | $8,277,080 |

| **MARTIN** | 12/07/00-11/11/05 | 151,206 | $3,522,238 |
|---|---|---|---|
| **KELBEL** | 06/16/03-01/04/06 | 187,500 | $4,385,323 |
| **NAGJI** | 08/08/06 | 12,000 | $385,800 |
| **SCHELL** | 02/28/05-02/13/06 | 150,000 | $4,357,586 |
| **COLLINS** | 12/08/00-11/11/05 | 75,000 | $1,480,214 |
| **CRANE** | 09/11/00-11/02/05 | 155,000 | $3,140,899 |
| **DICKERSON** | 06/04/02-11/11/05 | 67,750 | $1,307,677 |
| **FLAGG** | 05/27/05-03/27/06 | 32,500 | $1,230,999 |
| **FULKERSON** | 03/22/04-05/26/05 | 57,750 | $2,014,424 |
| **LACK** | 06/02/00-03/17/06 | 273,125 | $5,408,462 |
| **BUSH** | 10/02/01-11/08/05 | 93,000 | $2,286,329 |
| **TOTAL** | | **8,432,479** | **$183,269,568** |

56.     On August 14, 2006, HCC filed a Form 8-K with the SEC announcing an independent

internal review of the Company's historical stock option granting practices.

57.     On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company

would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock

option review had not been completed. Then, on November 17, 2006, HCC filed a Form 8-K with

the SEC, stating as follows:

> HCC Insurance Holdings, Inc. announced today the results of the Company's
> independent investigation of its historical stock option granting practices and certain
> changes in its executive management.
>
> The Company has substantially completed its previously announced
> independent investigation of the Company's stock option granting practices during
> the period of 1995 through the present. This comprehensive investigation was
> conducted by members of the Audit Committee, acting as an independent special
> committee of the Board of Directors (the "Special Committee"), with the assistance
> of Skadden, Arps, Slate, Meagher & Flom, LLP as independent legal counsel to the
> Special Committee and LECG as forensic accountants.
>
> The investigation has concluded that the Company used incorrect
> measurement dates for certain stock option grants covering a significant number of
> employees during the period from 1995 through 2006. The Company and the Special
> Committee are working with their advisors to determine the appropriate
> measurement dates and assess the related financial effects. LECG currently estimates
> the cumulative pre-tax financial impact of recording additional non-cash charges
> associated with stock option grants is not likely to exceed $37 million spread over the
> vesting periods of the options in question. The Company expects that the errors will
> require some increased tax provision. The Company is currently evaluating LECG's
> estimate for the financial impact and the related tax impact. Upon completion of this

evaluation, the Company will determine whether a restatement of certain previously filed financial statements will be required.

The Company intends to continue cooperating with the SEC in connection with its informal inquiry into this matter.

58. In effect, during the relevant period, the Defendants caused HCC's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed HCC to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of HCC's earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59. Plaintiff brings this action derivatively in the right and for the benefit of HCC to redress injuries suffered and to be suffered by HCC as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

60. Plaintiff will adequately and fairly represent the interests of HCC and its shareholders in enforcing and prosecuting its rights.

61. Plaintiff is an owner of HCC stock and was an owner of HCC stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

62. Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the

HCC Board of Directors to institute this action against the officers and members of the HCC Board of Directors is excused as futile. A pre-filing demand would be a useless and futile act because:

(a) The members of HCC's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b) The HCC Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from HCC's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to HCC and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the HCC Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

- 25 -

(c) The acts complained of constitute violations of the fiduciary duties owed by HCC's officers and directors and these acts are incapable of ratification.

(d) The members of HCC's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e) Any suit by the current directors of HCC to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f) HCC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for HCC any part of the damages HCC suffered and will suffer thereby.

(g) In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h) HCC's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of HCC. However, due to certain changes in the language of directors' and officers' liability insurance

policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by HCC against these Defendants, known as, *inter alia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of HCC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i) In order to bring this action for breaching their fiduciary duties, the members of the HCC Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

63. Plaintiff has not made any demand on shareholders of HCC to institute this action since such demand would be a futile and useless act for the following reasons:

(a) HCC is a publicly traded company with approximately111.1 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON HCC'S FINANCIAL STATEMENTS

### The Fiscal 1995 Form 10-K

64. On or about April 1, 1996, the Company filed its fiscal 1995 Form 10-K with the SEC. The fiscal 1995 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1995 Form 10-K included HCC's 1995 financial statements which were materially false

and misleading and presented in violation of GAAP, due to improper accounting for the backdated

stock options. As a result, HCC's compensation expense was understated and its net earnings were

overstated.

**The Fiscal 1996 Form 10-K**

65. On or about March 31, 1997, the Company filed its fiscal 1996 Form 10-K with the

SEC. The fiscal 1996 Form 10-K was simultaneously distributed to shareholders and the public.

The fiscal 1996 Form 10-K included HCC's 1996 financial statements which were materially false

and misleading and presented in violation of GAAP, due to improper accounting for the backdated

stock options. As a result, HCC's compensation expense was understated and its net earnings were

overstated.

**The Fiscal 1997 Form 10-K**

66. On or about March 31, 1998, the Company filed its fiscal 1997 Form 10-K with the

SEC. The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public.

The fiscal 1997 Form 10-K included HCC's 1997 financial statements which were materially false

and misleading and presented in violation of GAAP, due to improper accounting for the backdated

stock options. As a result, HCC's compensation expense was understated and its net earnings were

overstated.

**The Fiscal 1998 Form 10-K405**

67. On or about March 31, 1999, the Company filed its fiscal 1998 Form 10-K405 with

the SEC. The fiscal 1998 Form 10-K405 was simultaneously distributed to shareholders and the

public. The fiscal 1998 Form 10-K405 included HCC's 1998 financial statements which were

materially false and misleading and presented in violation of GAAP, due to improper accounting for

the backdated stock options. As a result, HCC's compensation expense was understated and its net

earnings were overstated.

**The Fiscal 1999 Form 10-K**

68.     On or about March 30, 2000, the Company filed its fiscal 1999 Form 10-K with the SEC. The 1999 Form 10-K was simultaneously distributed to shareholders and the public. The 1999 Form 10-K included HCC's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2000 Form 10-K**

69.     On or about April 2, 2001, the Company filed its fiscal 2000 Form 10-K with the SEC. The 2000 Form 10-K was simultaneously distributed to shareholders and the public. The 2000 Form 10-K included HCC's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2001 Form 10-K**

70.     On or about April 1, 2002, the Company filed its fiscal 2001 Form 10-K with the SEC. The 2001 Form 10-K was simultaneously distributed to shareholders and the public. The 2001 Form 10-K included HCC's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

71.     On or about March 28, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC. The 2002 Form 10-K was simultaneously distributed to shareholders and the public. The

2002 Form 10-K included HCC's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

72.     On or about March 15, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC. The 2003 Form 10-K was simultaneously distributed to shareholders and the public. The 2003 Form 10-K included HCC's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

73.     On or about March 16, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC. The 2004 Form 10-K was simultaneously distributed to shareholders and the public. The 2004 Form 10-K included HCC's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

74.     On or about March 16, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC. The 2005 Form 10-K was simultaneously distributed to shareholders and the public. The 2005 Form 10-K included HCC's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

75. The 1995-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1995 and 2006. In fact, it was not until August 2006 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of HCC, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

76. On August 14, 2006, HCC filed a Form 8-K with the SEC announcing an independent internal review of the Company's historical stock option granting practices.

77. On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock option review had not been completed. Then, on November 17, 2006, HCC filed a Form 8-K with the SEC, stating the Company had used incorrect measurement dates for certain stock option grants.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

78. Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions. Given the many times HCC's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

79. As a result of the backdating of options, Defendants have been unjustly enriched at the expense of HCC, which has received and will receive less money from Defendants when they

exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

80.     The Counts alleged herein are timely. As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring HCC's public investors that HCC's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

81.     HCC's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until August 2006 when the Company announced it had initiated an internal review of its stock option grant practices. On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock option review had not been completed. Then, on November 17, 2006, the Company announced the results of its independent investigation of the Company's historical stock option granting practices:

> HCC Insurance Holdings, Inc. announced today the results of the Company's independent investigation of its historical stock option granting practices and certain changes in its executive management.
>
> The Company has substantially completed its previously announced independent investigation of the Company's stock option granting practices during the period of 1995 through the present. This comprehensive investigation was conducted by members of the Audit Committee, acting as an independent special committee of the Board of Directors (the "Special Committee"), with the assistance of Skadden, Arps, Slate, Meagher & Flom, LLP as independent legal counsel to the Special Committee and LECG as forensic accountants.

The investigation has concluded that the Company used incorrect measurement dates for certain stock option grants covering a significant number of employees during the period from 1995 through 2006. The Company and the Special Committee are working with their advisors to determine the appropriate measurement dates and assess the related financial effects. LECG currently estimates the cumulative pre-tax financial impact of recording additional non-cash charges associated with stock option grants is not likely to exceed $37 million spread over the vesting periods of the options in question. The Company expects that the errors will require some increased tax provision. The Company is currently evaluating LECG's estimate for the financial impact and the related tax impact. Upon completion of this evaluation, the Company will determine whether a restatement of certain previously filed financial statements will be required.

The Company intends to continue cooperating with the SEC in connection with its informal inquiry into this matter.

82.    Finally, as fiduciaries of HCC and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from HCC's public shareholders the facts that give rise to the claims asserted herein, *i.e.,* that the HCC Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

83.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

85.     The 1995-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing HCC to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1995.

86.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

87.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

88.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     At all relevant times, Defendants, as directors and/or officers of HCC, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

91.     In breach of their fiduciary duties owed to HCC and its shareholders, the Defendants caused HCC, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of HCC and/or failed to properly investigate whether these grants had been

- 34 -

improperly made. By this wrongdoing, the Defendants breached their fiduciary duties owed to HCC and its shareholders.

92.     The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

93.     As a result of Defendants' misconduct, HCC has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

94.     Plaintiff demands an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     Each of the Defendants agreed to and did participate with Way and Bramanti and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

97.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to HCC and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of HCC and its shareholders.

- 35 -

98.     As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to HCC and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

99.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward HCC and its public shareholders.

100.    As a proximate result of Defendants' conduct, in concert with Way and Bramanti, HCC has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, HCC, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at HCC.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding HCC.

103.    Defendants' conduct constituted an abuse of their ability to control and influence HCC.

104.    By reason of the foregoing, HCC has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

105.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.     Defendants had a duty to HCC and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of HCC.

107.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of HCC in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of HCC's affairs and in the use and preservation of HCC's assets.

108.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused HCC to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to HCC, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged HCC.

109.     By reason of the foregoing, HCC has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

110.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.   As corporate fiduciaries, Defendants owed to HCC and its shareholders a duty of candor and full accurate disclosure regarding the true state of HCC's business and assets and their conduct with regard thereto.

112.   As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from HCC's shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship of HCC. Thus they have committed constructive fraud and violated their duty of candor.

113.   By reason of the foregoing, HCC has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

114.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.   By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused HCC to waste valuable corporate assets.

116.   As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

117.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.   As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of HCC, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

119.    All the payments and benefits provided to the Defendants were at the expense of HCC. The Company received no benefit from these payments. HCC was damaged by such payments.

120.    Certain of the Defendants sold HCC stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of HCC. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for Rescission

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

122.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and HCC entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by HCC shareholders and filed with the SEC.

123.    All contracts which provide for stock option grants between the Officer Defendants and HCC and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth
above, as though fully set forth herein.

125.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the
information described above, and sold HCC common stock on the basis of such information.

126.    The information described above was proprietary non-public information concerning
the Company's financial condition and future business prospects.    It was a proprietary asset
belonging to the Company, which the Insider Selling Defendants used for their own benefit when
they sold HCC common stock.

127.    At the time of their stock sales, the Insider Selling Defendants knew that the
Company's revenues were materially overstated.    The Insider Selling Defendants' sales of HCC
common stock while in possession and control of this material adverse non-public information was a
breach of their fiduciary duties of loyalty and good faith.

128.    Since the use of the Company's proprietary information for their own gain constitutes
a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the
imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses
and damages suffered as a result of the acts and transactions complained of herein, together with pre-
judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits
and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

     C.     Directing HCC to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

     (i)     a proposal requiring that the office of CEO of HCC and Chairman of the HCC Board of Directors be permanently held by separate individuals and that the Chairman of the HCC Board meets rigorous "independent" standards;

     (ii)     a proposal to strengthen the HCC Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     (iii)     appropriately test and then strengthen the internal audit and control function;

     (iv)     rotate independent auditing firms every five years;

     (v)     control and limit insider stock selling and the terms and timing of stock option grants; and

     (vi)     reform executive compensation.

     D.     Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

     E.     Awarding punitive damages;

     F.     As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference

between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

      G.      As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

      H.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

      I.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

      Plaintiff demands a trial by jury.

DATED: February 1, 2007

CROWLEY DOUGLAS & NORMAN, LLP
TIMOTHY J. CROWLEY (051707000)
RICHARD E. NORMAN (00788128)

RICHARD E. NORMAN

1301 McKinney Street, Suite 3500
Houston, TX 77010-3034
Telephone: 713/651-1771
713/651-1775 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
TRAVIS E. DOWNS III
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt HCC Insurance Holdings Derv.doc

## HCC INSURANCE HOLDINGS, INC. VERIFICATION

I, Harry A. Bacas, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 1/23/2007

SIGNATURE