UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| HARRY A. BACAS and GAIL HALGREN Derivatively on Behalf of HCC INSURANCE HOLDINGS, INC., | § § § | Civil Action No. 4:07-cv-00456 **(Consolidated)** |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| STEPHEN L. WAY, et al., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| – and – | § | |
| | § | |
| HCC INSURANCE HOLDINGS, INC., a Delaware corporation, | § § | |
| | § | |
| Nominal Defendant. | § | |
| | § | |

**CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, GROSS MISMANAGEMENT, CONSTRUCTIVE FRAUD, UNJUST ENRICHMENT, BREACH OF CONTRACT AND FOR AN ACCOUNTING**

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought by shareholders of HCC Insurance Holdings, Inc. ("HCC" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").   This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior HCC insiders to divert hundreds of millions of dollars of corporate assets to themselves and other employees via the manipulation of grant dates associated with hundreds of thousands of stock options granted to HCC insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to corporate employees from 1995 to 2006.

2.       Between 1995 and 2006, Defendants also caused HCC to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by HCC carried with them an exercise price that was ***not less than*** the fair market value of HCC stock on the date of grant and issuance.

3.       In fact, Defendants were aware the Board ***backdated*** stock option grants to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By August 2006, Defendants' backdating had yielded stock option grants to the Company's executive officers worth millions of dollars.  These grants were included in more than $252 million in stock sale proceeds for Defendants.

4.       Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Texas and Delaware law.  By

authorizing and/or acquiescing in the stock option backdating, Defendants: (i) caused HCC to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior HCC executives; and (iii) subjected HCC to potential liability from regulators including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed HCC and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed HCC to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of HCC's earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on HCC.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding HCC's internal control problems, abused their fiduciary relationship with the Company by selling over $252 million worth of their personally held shares at artificially inflated prices during the relevant period.  This action seeks recovery for HCC against these faithless fiduciaries, as HCC's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under Texas and Delaware law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  HCC is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants are citizens of Texas and reside in this District.

## PARTIES

11.     Plaintiff Harry A. Bacas, is a shareholder of HCC, and held his HCC stock during the time of the backdating related misconduct of which he complains.

12.     Plaintiff Gail Halgren, is a shareholder of HCC, and held her HCC stock during the time of the backdating-related conduct of which she complains.

13.     Nominal party HCC provides property and casualty, surety, group life, and accident and health insurance products and related agency and reinsurance brokerage services in the United States, the United Kingdom, Spain, Ireland and Bermuda.  HCC is a Delaware corporation with its principal executive offices located at 13403 Northwest Freeway, Houston, Texas.

14.     Defendant Stephen L. Way ("Way") founded HCC in 1974 and served as a director, Chairman of the Board and Chief Executive Officer ("CEO") of the Company from its inception until his resignation on November 17, 2006.  Defendant Way remains with the Company on a consulting basis and as non-executive Chairman of the Board.  Additionally, Way served as President of HCC from 1974 to 1996 and from 2002 to March 2006.  Because of Way's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Way, along with members of HCC's compensation committee, engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Way knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Way participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed HCC's reports on Forms 10-Q and 10-K, HCC's Proxies, and Sarbanes-Oxley certifications.  Based on his knowledge of material non-public information regarding the Company, Defendant Way sold 5.2 million shares of HCC stock for proceeds of $119.5 million during the relevant period.  The backdated stock options Way received

constituted illegal compensation from HCC that was not disclosed to the Company's shareholders. Defendant Way may be served at 10 East Bend Lane, Houston, Texas 77007.

15.     Defendant Frank J. Bramanti ("Bramanti") has served as a director of HCC since 1980 and as CEO since November 17, 2006.  Previously, Bramanti served in various capacities, including Interim President, Executive Vice President, Chief Financial Officer ("CFO") and Secretary of HCC from 1980 to 2001.  Because of Bramanti's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Bramanti, by his specialized financial expertise, was in a unique position to understand the business of HCC as well as its finances, markets and present and future business prospects. Through this and his receipt of tens of thousands of shares of backdated stock options, Bramanti knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Bramanti participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and 10-Q, and Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Bramanti sold 1.17 million shares of HCC stock for proceeds of $20.5 million during the relevant period.  The backdated stock options Bramanti received constituted illegal compensation from HCC that was not disclosed to the

Company's shareholders.  Defendant Bramanti may be served at 13403 Northwest Freeway, Houston, Texas 77040.

16.     Defendant Stephen J. Lockwood ("Lockwood") served as a director of HCC from 1981 until March 31, 2002.  While a director of HCC, Lockwood served as Vice-Chairman of the Board and, until December of 1999, Lockwood served as Chief Executive Officer of LDG Reinsurance Corporation, one of HCC's subsidiaries.  Because of Lockwood's positions, he knew the adverse non-public information about the business of HCC as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Through this and through his receipt of tens of thousands of shares of backdated stock options, Lockwood knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants and that HCC was issuing false and misleading statements as a result thereof.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Lockwood signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, Defendant Lockwood sold over 4.3 million shares of HCC stock for proceeds of over $63.8 million during the relevant period.  The backdated stock options Lockwood received constitute illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Lockwood may be served at 4505 Holt Street, Bellaire, Texas 77401.

17.     Defendant Peter B. Smith, Jr. ("Smith") joined HCC in 1993 and served as Vice President, Executive Vice President, and as a director, before leaving HCC.  Smith also served as a director and officer of HCC subsidiaries, including HCC Intermediaries, Inc., where he served as

Chief Executive Officer.  Because of Smith's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Through this and through his receipt of tens of thousands of shares of backdated stock options, Smith knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants and that HCC was issuing false and misleading statements as a result thereof.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Smith signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, Defendant Smith sold 150,000 shares of HCC stock for proceeds of over $2.1 million during the relevant period.  The backdated stock options Smith received constitute illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Smith may be served at 4505 Holt Street, Bellaire, Texas 77401.

18.    Defendant Edward H. Ellis, Jr. ("Ellis") has been a director of HCC since 2001, and CFO and Executive Vice President of HCC since 1997.  Because of Ellis's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Defendant Ellis, by his specialized financial expertise, was in a unique position to understand the business of HCC as well as its finances, markets and present and future business prospects.  Through this and his receipt of tens of thousands of shares of backdated stock options, Ellis knew or severely recklessly disregarded

that HCC's executives and directors were backdating stock option grants. Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Ellis participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and 10-Q, Proxies, and Sarbanes-Oxley certifications. Based on his knowledge of material non-public information regarding the Company, Defendant Ellis sold 255,000 shares of HCC stock for proceeds of $5.3 million during the relevant period. The backdated stock options Ellis received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders. Defendant Ellis may be served at 13403 Northwest Freeway, Houston, Texas 77040.

19.     Defendant John N. Molbeck, Jr. ("Molbeck") has served as a director of HCC since 1997 and as President and Chief Operating Officer ("COO") since March 2006. Additionally, Molbeck served as President and COO of the Company from 1997 to 2002. Because of Molbeck's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Through this and his receipt of tens of thousands of shares of backdated stock options, Molbeck knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants. Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Molbeck participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and 10-Q,

and Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Molbeck sold 490,998 shares of HCC stock for proceeds of $8.2 million during the relevant period.  The backdated stock options Molbeck received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Molbeck may be served at 13403 Northwest Freeway, Houston, Texas 77040.

20.     Defendant Christopher L. Martin ("Martin") was Executive Vice President, General Counsel and Secretary of HCC from 1997 until his resignation on November 17, 2006.  Because of Martin's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Through this and his receipt of tens of thousands of shares of backdated stock options, Martin knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Martin participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Martin sold 151,206 shares of HCC stock for proceeds of $3.5 million during the relevant period.  The backdated stock options Martin received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Martin may be served at 4505 Holt Street, Bellaire, Texas 77401.

21.     Defendant Benjamin D. Wilcox ("Wilcox") joined HCC in December 1998 and he served as an Executive Vice President of HCC and as President and Chief Executive Officer of

Houston Casualty Company, HCC Life Insurance Company and Avemco Insurance Company until 2002. Wilcox also served as a director and officer of other HCC subsidiaries besides those identified above. Because of Wilcox's positions, he knew the adverse, non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Through this and his receipt of tens of thousands of backdated stock options, Wilcox knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants. Based on his knowledge of material non-public information regarding the Company, Defendant Wilcox sold nearly 190,000 shares of HCC stock for proceeds of over $3.3 million during the relevant period. The backdated stock options Wilcox received constitute illegal compensation from HCC that was not disclosed to the Company's shareholders. Defendant Wilcox may be served at 4505 Holt Street, Bellaire, Texas 77401.

22.     Defendant Edwin H. Frank, III ("Frank") served as a director of HCC from 1993 to 2003. Because of Frank's position, he knew the adverse, non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with HCC corporate officers, employees and directors, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Frank worked on HCC's Audit Committee during 1998 and on HCC's Compensation Committee during 1999 and 2000. As a member of the Audit Committee, Defendant Frank caused or allowed the dissemination of false and misleading statements in connection with HCC's financial statements described herein. While working on HCC's Compensation Committee, Frank participated in (and did work in connection with) three meetings and two meetings during 1999 and 2000, respectively, during which

he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Frank knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Frank signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Proxies and Reports on Form 10-K.  Based on his knowledge of material non-public information regarding the Company, Defendant Frank sold 67,500 shares of HCC stock for proceeds of over $1.2 million during the relevant period.  The backdated stock options Frank received constitute illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Frank may be served at 4505 Holt Street, Bellaire, Texas 77401.

23.     Defendant Hugh T. Wilson ("Wilson") served as a director of HCC from 1981 until his resignation in December 1998.  Because of Wilson's position, he knew the adverse, non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and via reports and other information provided to him in connection therewith.  Wilson worked on HCC's Audit Committee during 1995-1997 and on HCC's Compensation Committee during 1995-1998.  While working on HCC's Compensation Committee, Wilson participated in (and did work in connection with) five meetings, three meetings, and one meeting during 1996, 1997, and 1998, respectively, during which he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Wilson knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Wilson signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Proxies and

Reports on Form 10-K.  The backdated stock options Wilson received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Wilson may be served at 4505 Holt Street, Bellaire, Texas 77401.

24.     Defendant Craig J. Kelbel ("Kelbel ") has been Executive Vice President of HCC and President and CEO of HCC Life Insurance Company, a division of HCC, since 1999.  Because of Kelbel's positions, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Through this and his receipt of tens of thousands of shares of backdated stock options, Kelbel knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Kelbel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, Defendant Kelbel sold 187,500 shares of HCC stock for proceeds of $4.3 million during the relevant period.  The backdated stock options Kelbel received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Kelbel may be served at 13403 Northwest Freeway, Houston, Texas 77040.

25.     Defendant Farid F. Nagji ("Nagji") has been Executive Vice President, Administration and Corporate Services of HCC since March 2006.  Previously, Nagji served as Senior Vice President and Chief Information Officer of the Company from 2003 to June 2005, and Senior Vice President, Office of the Chairman of HCC from June 2005 to March 2006.  Because of Nagji's positions, he knew the adverse non-public information about the business of HCC, as well as

its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Through this and his receipt of tens of thousands of shares of backdated stock options, Nagji knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants. Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Nagji participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, Defendant Nagji sold 12,000 shares of HCC stock for proceeds of $385,800 during the relevant period. The backdated stock options Nagji received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders. Defendant Nagji may be served at 13403 Northwest Freeway, Houston, Texas 77040.

26.     Defendant Michael J. Schell ("Schell") has been Executive Vice President of HCC since 2002. Because of Schell's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Through this and his receipt of tens of thousands of shares of backdated stock options, Schell knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants. Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Schell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public

information regarding the Company, Defendant Schell sold 150,000 shares of HCC stock for proceeds of $4.3 million during the relevant period. The backdated stock options Schell received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders. Defendant Schell may be served at 13403 Northwest Freeway, Houston, Texas 77040.

27.     Defendant Patrick B. Collins ("Collins") has been a director of HCC since 1993. Because of Collins' position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Collins worked on HCC's Audit Committee during 1995-1998. As a member of the Audit Committee, Defendant Collins caused or allowed the dissemination of materially false and misleading statements in connection with HCC's financial statements described herein. Collins worked on HCC's Compensation Committee during 1995-1997. While working on HCC's Compensation Committee, Collins participated in (and did work in connection with) five meetings and three meetings during 1996 and 1997, respectively, during which he engaged in backdating stock options. Through this and his receipt of tens of thousands of shares of backdated stock options, Collins knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants. Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Collins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies. Based on his knowledge of material non-public information regarding the Company, Defendant Collins sold 75,000 shares of HCC stock for proceeds of $1.4 million during the relevant period. The backdated

stock options Collins received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Collins may be served at 14018 Taylorcrest Road, Houston, Texas 77079.

28.     Defendant James R. Crane ("Crane") has been a director of HCC since 1999. Because of Crane's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating & Corporate Governance Committee, Defendant Crane caused or allowed the dissemination of the improper public statements described herein.  Crane worked on HCC's Compensation Committee during 2000-2006.  While working on HCC's Compensation Committee, Crane participated (and did work in connection with) in two meetings, two meetings, four meetings, and three meetings during 2000, 2001, 2002 and 2003, respectively, and also participated in numerous meetings during 2004-2005, during which he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Crane knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Crane participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Crane sold 155,000 shares of HCC stock for proceeds of $3.1 million during the relevant period.  The backdated options Crane received constituted illegal compensation from HCC that was

not disclosed to the Company's shareholders.  Defendant Crane may be served at 1702 North Blvd.,

Houston, Texas 77079.

29.     Defendant J. Robert Dickerson ("Dickerson") has been a director of HCC since 1981.

Because of Dickerson's position, he knew the adverse non-public information about the business of

HCC, as well as its finances, markets and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at Board meetings and committees thereof and via reports and other

information provided to him in connection therewith.  As a member of the Nominating & Corporate

Governance Committee, Defendant Dickerson caused or allowed the dissemination of the improper

public statements described herein.  Dickerson worked on HCC's Audit Committee during 1995-

1997 and 1999-2004.  As a member of HCC's Audit Committee, Dickerson caused or allowed the

dissemination of materially false and misleading statements in connection with HCC's financial

statements described herein.  Dickerson worked on HCC's Compensation Committee during 1995-

1999.  While working on HCC's Compensation Committee, Dickerson participated in (and did work

in connection with) five meetings, three meetings, one meeting, and three meetings during 1996,

1997, 1998, and 1999, respectively, during which he engaged in backdating stock options.  Through

this and his receipt of tens of thousands of shares of backdated stock options, Dickerson knew or

severely recklessly disregarded that HCC's executives and directors were backdating stock option

grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors

were backdating stock option grants, Dickerson participated in the issuance of false and/or

misleading statements, including the preparation and approval of false and/or misleading press

releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC

filings, including HCC's Reports on Forms 10-K and Proxies.  Based on his knowledge of material

non-public information regarding the Company, Defendant Dickerson sold 67,750 shares of HCC

stock for proceeds of $1.3 million during the relevant period.  The backdated stock options Dickerson received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Dickerson may be served at 6110 Pebble Beach Drive, Houston, Texas 77069.

30.    Defendant Walter M. Duer ("Duer") has been a director of HCC since 2004.  Because of Duer's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Duer worked on HCC's Audit Committee during July 2004-2006.  As a member of the Audit Committee, Defendant Duer caused or allowed the dissemination of materially false and misleading statements in connection with HCC's financial statements described herein. Through this and his receipt of tens of thousands of shares of backdated stock options, Duer knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Duer participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  The backdated stock options Duer received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Duer may be served at 3707 Chevy Chase Drive, Houston, Texas 77019.

31.    Defendant James C. Flagg ("Flagg") has been a director of HCC since 2001.  Because of Flagg's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Flagg worked on HCC's Audit Committee during 2001-2006.  As a member of HCC's Audit Committee, Flagg caused or allowed the dissemination of materially false and misleading statements in connection with HCC's financial statements described herein.  Through this and his receipt of tens of thousands of shares of backdated stock options, Flagg knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Flagg participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Flagg sold 32,500 shares of HCC stock for proceeds of $1.2 million during the relevant period.  The backdated stock options Flagg received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Flagg may be served at 5707 Paint Trail, College Station, Texas 77845.

32.     Defendant Allan W. Fulkerson ("Fulkerson") has been a director of HCC since 1997.  Because of Fulkerson's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Fulkerson is a member (Chair) of the Investment Committee.  Through this and his receipt of tens of thousands of shares of backdated stock options, Fulkerson knew or severely recklessly disregarded that HCC's executives and

directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Fulkerson participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  Based on his knowledge of material non-public information regarding the Company, Defendant Fulkerson sold 57,750 shares of HCC stock for proceeds of $2 million during the relevant period.  The backdated stock options Fulkerson received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Fulkerson may be served at 900 Snowberry Lane, Sanibel, Florida 33957.

33.    Defendant Walker J. Lack ("Lack") was a director of HCC from 1981 to November 8, 2006.  Because of Lack's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Lack was the designated Lead Independent Director of the Company's Board.  As a member of the Nominating & Corporate Governance Committee, Defendant Lack allowed the dissemination of false statements alleged herein.  Lack worked on HCC's Compensation Committee during 1999-2006.  While working on HCC's Compensation Committee, Lack participated (and did work in connection with) in three meetings, two meetings, two meetings, four meetings, and three meetings during 1999, 2000, 2001, 2002, and 2003, respectively, and also participated in numerous meetings during 2004-2005, during which he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Lack knew or severely recklessly disregarded that HCC's

executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Lack participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies. Based on his knowledge of material non-public information regarding the Company, Defendant Lack sold 273,125 shares of HCC stock for proceeds of $5.4 million during the relevant period.  The backdated stock options Lack received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Lack may be served at 17069 Oakview Drive, Encino, California 91436.

34.     Defendant Michael A. F. Roberts ("Roberts") has been a director of HCC since 2002. Because of Roberts' position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating & Corporate Governance Committee, Defendant Roberts allowed the dissemination of false statements alleged herein.  Defendant Roberts is a member of the Investment Committee.  Roberts worked on HCC's Compensation Committee during 2003-2006.  While working on HCC's Compensation Committee, Roberts participated (and did work in connection with) in three meetings during 2003, and also participated in numerous meetings during 2004-2005, during which he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Roberts knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's

executives and directors were backdating stock option grants, Roberts participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  The backdated stock options Roberts received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Roberts may be served at 73 Apple Tree Lane, New Canaan, Connecticut 06840.

35.     Defendant Marvin P. Bush ("Bush") was a director of HCC from 1999 until 2002, when he became an advisory director.  Because of Bush's position, he knew the adverse non-public information about the business of HCC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Bush is a member of the Investment Committee.  Bush worked on HCC's Compensation Committee during 2001-November 2002.  While working on HCC's Compensation Committee, Bush participated in (and did work in connection with) two meetings and four meetings during 2001 and 2002, respectively, during which he engaged in backdating stock options.  Through this and his receipt of tens of thousands of shares of backdated stock options, Bush knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants.  Although he knew or severely recklessly disregarded that HCC's executives and directors were backdating stock option grants, Bush participated in the issuance of false and/or misleading statements, including the preparation and approval of false and/or misleading press releases and SEC filings, and signed and/or authorized the issuance of false and misleading SEC filings, including HCC's Reports on Forms 10-K and Proxies.  Based on his knowledge of material non-public information regarding the

Company, Defendant Bush sold 93,000 shares of HCC stock for proceeds of $2.2 million during the relevant period.  The backdated stock options Bush received constituted illegal compensation from HCC that was not disclosed to the Company's shareholders.  Defendant Bush may be served at 6202 Fort Hunt Road, Alexandria, Virginia 22307.

36.     The Defendants identified in ¶¶14-19, 22-23, 27-35 are referred to herein as the "Director Defendants."  The Defendants identified in ¶¶14-15, 17-21, 24-25 are referred to herein as the "Officer Defendants."  The Defendants identified in ¶¶14-29, 31-35 are referred to herein as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

37.     Each officer and director of HCC named herein owed the Company and HCC shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of HCC's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of HCC.  Further, the misconduct of HCC's officers has been ratified by HCC's Board, which has failed to take any legal action on behalf of the Company against them.

38.     By reason of their positions as officers, directors and fiduciaries of HCC and because of their ability to control the business and corporate affairs of the Company, the Defendants owed HCC and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage HCC in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of HCC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over HCC to divert assets to themselves via improper and/or unlawful practices.  Defendants also

had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

39.     Because of their positions of control and authority as directors or officers of HCC, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause HCC to disseminate false Proxy Statements for 1995-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with HCC, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to HCC shareholders and the financial markets but failed to do so.

40.     Between 1995 and 2006, Defendants concealed that the stock option grants had been repeatedly and consciously **backdated** to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, Plaintiffs seek to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, Plaintiffs seek to have all of the unexercised options granted to Defendants from as early as 1995 to 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

41.     To discharge their duties, the directors of HCC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and

financial affairs of HCC.  By virtue of such duties, the officers and directors of HCC were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of HCC in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of HCC);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of HCC to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of HCC to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of HCC's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of HCC and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that HCC's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in HCC stock by the officers and employees of HCC; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from HCC and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of HCC and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

42.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of HCC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised HCC's entire Board during the relevant period.

43.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result,

HCC has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

       (a)     improvidently paid executive compensation;

       (b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

       (c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

       (d)     incurring possible IRS penalties for improperly reporting compensation.

44.     These actions have irreparably damaged HCC's corporate image and goodwill.  For at least the foreseeable future, HCC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that HCC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

46.     During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to HCC insiders and directors and causing HCC to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at HCC and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of HCC, regarding Defendants' compensation practices and HCC's financial performance.

47.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of HCC common stock so they could dispose of millions of dollars of their own HCC stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

48.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent HCC's financial results.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

49.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

50.     HCC provides property and casualty, surety, group life, and accident and health insurance products and related agency and reinsurance brokerage services in the United States, the United Kingdom, Spain, Ireland and Bermuda.  It provides insurance and/or reinsurance underwriting services in the lines of business, including diversified financial products, such as directors' and officers' liability, professional indemnity, employment practices liability and surety; group life, accident, and health; aviation; London market account, including energy, marine,

property, and accident and health; and other specialty lines of insurance.  The Company markets its products directly to customers, as well as through a network of independent and affiliated brokers, producers and agents.  The Company was founded in 1974 and is headquartered in Houston, Texas.

51.     Throughout the relevant period, Defendants caused HCC to grant them millions of stock options permitting them to buy HCC stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

52.     However, many of the millions of options granted to HCC's executives had a hidden, valuable component: they were misdated and mispriced, often making them even more significantly valuable.  The misdated and mispriced stock option grants fell largely into four categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used); and (iv) options were granted and then repriced downward.  Each of these categories of backdating obviously contravened the Company's stock option plans.

- 28 -

53.     Complicating matters and magnifying the harm to HCC, during the relevant period, HCC's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

54.     Specifically, in many instances the reported dates HCC stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

55.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to HCC a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems HCC faced because of its deficient internal controls.  Furthermore, the Defendants who were members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies.  Defendants, as directors or officers of HCC, had ample opportunity to

discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of the Board.  Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by HCC to the investing public and the Company's shareholders during the relevant period.

56.     Specifically, since at least 1995, Defendants have caused HCC to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR | REPORTED EARNINGS (LOSS) (in millions) |
|---|---|
| 1995 | $24.34 |
| 1996 | $38.53 |
| 1997 | $49.76 |
| 1998 | $72.28 |
| 1999 | $25.12 |
| 2000 | $55.47 |
| 2001 | $30.20 |
| 2002 | $105.83 |
| 2003 | $143.56 |
| 2004 | $163.03 |
| 2005 | $195.86 |

57.     Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated.  The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period.  In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were backdated and mispriced.

58.     Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $252 million worth of HCC stock – stock they obtained often by cashing in under-priced stock options:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| BRAMANTI | FRANK | 8/14/2000 | 76,239 | $14.53 | $1,107,752 |
| | | 8/23/2000 | 3,300 | $14.33 | $47,289 |
| | | 8/24/2000 | 7,500 | $14.08 | $105,600 |
| | | 9/1/2000 | 64,200 | $14.08 | $903,935 |
| | | 11/20/2000 | 67,500 | $16.00 | $1,079,999 |
| | | 12/1/2000 | 75,000 | $17.16 | $1,286,999 |
| | | 8/10/2001 | 300,000 | $16.66 | $4,997,998 |
| | | 10/9/2001 | 195,750 | $18.60 | $3,640,948 |
| | | 10/10/2001 | 85,500 | $18.21 | $1,556,954 |
| | | 10/16/2001 | 150,000 | $19.30 | $2,894,998 |
| | | 10/16/2001 | 75,000 | $19.30 | $1,447,499 |
| | | 10/16/2001 | 40,095 | $19.30 | $773,833 |
| | | 10/16/2001 | 37,500 | $19.30 | $723,750 |
| | | | 1,177,583 | | $20,567,555 |
| | | | | | |
| BUSH | MARVIN | 10/2/2001 | 21,750 | $17.26 | $375,405 |
| | | 10/2/2001 | 7,500 | $17.33 | $129,975 |
| | | 5/28/2003 | 30,000 | $18.88 | $566,400 |
| | | 5/20/2005 | 18,750 | $39.60 | $742,500 |
| | | 11/8/2005 | 15,000 | $31.47 | $472,050 |
| | | | 93,000 | | $2,286,329 |
| | | | | | |
| COLLINS | PATRICK | 12/8/2000 | 15,000 | $16.66 | $249,900 |
| | | 12/8/2000 | 7,500 | $16.66 | $124,950 |
| | | 12/8/2000 | 7,500 | $16.66 | $124,950 |
| | | 10/4/2001 | 15,000 | $18.32 | $274,800 |
| | | 7/9/2003 | 15,000 | $20.46 | $306,900 |
| | | 7/9/2003 | 7,500 | $20.46 | $153,450 |
| | | 11/11/2005 | 7,200 | $32.70 | $235,440 |
| | | 11/11/2005 | 300 | $32.75 | $9,825 |
| | | | 75,000 | | $1,480,214 |
| | | | | | |
| CRANE | JAMES | 9/11/2000 | 75,000 | $14.34 | $1,075,499 |
| | | 5/16/2001 | 30,000 | $16.98 | $509,400 |
| | | 11/2/2005 | 50,000 | $31.12 | $1,556,000 |
| | | | 155,000 | | $3,140,899 |
| | | | | | |
| DICKERSON | J | 6/4/2002 | 12,450 | $16.91 | $210,529 |
| | | 6/4/2002 | 3,300 | $16.91 | $55,803 |
| | | 6/4/2002 | 750 | $16.96 | $12,720 |
| | | 7/22/2002 | 18,750 | $13.60 | $255,000 |
| | | 7/22/2002 | 15,000 | $13.60 | $204,000 |
| | | 11/11/2005 | 17,500 | $32.55 | $569,625 |
| | | | 67,750 | | $1,307,677 |
| | | | | | |
| ELLIS | EDWARD | 11/30/2000 | 15,000 | $16.33 | $244,950 |
| | | 11/30/2000 | 7,500 | $16.66 | $124,950 |
| | | 11/30/2000 | 7,500 | $16.83 | $126,225 |
| | | 11/30/2000 | 6,000 | $16.58 | $99,480 |
| | | 11/30/2000 | 1,500 | $16.50 | $24,750 |
| | | 10/9/2001 | 37,500 | $18.53 | $694,875 |

- 31 -

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
|  |  | 6/27/2002 | 12,000 | $17.40 | $208,800 |
|  |  | 6/27/2002 | 7,500 | $17.42 | $130,650 |
|  |  | 6/27/2002 | 6,900 | $17.43 | $120,267 |
|  |  | 6/27/2002 | 4,500 | $17.34 | $78,030 |
|  |  | 6/27/2002 | 3,000 | $17.30 | $51,900 |
|  |  | 6/27/2002 | 3,000 | $17.42 | $52,260 |
|  |  | 6/27/2002 | 600 | $17.32 | $10,392 |
|  |  | 5/29/2003 | 15,000 | $18.81 | $282,150 |
|  |  | 5/26/2004 | 37,500 | $21.78 | $816,750 |
|  |  | 5/10/2005 | 90,000 | $25.74 | $2,316,599 |
|  |  |  | **255,000** |  | **$5,383,025** |
|  |  |  |  |  |  |
| FLAGG | JAMES | 5/27/2005 | 22,500 | $39.60 | $890,999 |
|  |  | 3/27/2006 | 10,000 | $34.00 | $340,000 |
|  |  |  | **32,500** |  | **$1,230,999** |
|  |  |  |  |  |  |
| FULKERSON | ALLAN | 3/22/2004 | 15,000 | $21.72 | $325,800 |
|  |  | 5/26/2005 | 42,750 | $39.50 | $1,688,624 |
|  |  |  | **57,750** |  | **$2,014,424** |
|  |  |  |  |  |  |
| KELBEL | CRAIG | 6/16/2003 | 37,500 | $19.33 | $724,875 |
|  |  | 6/23/2004 | 15,000 | $21.68 | $325,200 |
|  |  | 6/24/2004 | 15,000 | $21.73 | $325,950 |
|  |  | 6/24/2004 | 3,750 | $21.70 | $81,375 |
|  |  | 6/25/2004 | 41,250 | $21.78 | $898,424 |
|  |  | 2/17/2005 | 37,500 | $24.16 | $906,000 |
|  |  | 1/4/2006 | 37,500 | $29.96 | $1,123,500 |
|  |  |  | **187,500** |  | **$4,385,323** |
|  |  |  |  |  |  |
| LACK | WALTER | 6/2/2000 | 15,000 | $11.42 | $171,300 |
|  |  | 9/6/2000 | 15,000 | $14.00 | $210,000 |
|  |  | 9/8/2000 | 15,000 | $14.12 | $211,800 |
|  |  | 9/11/2000 | 15,000 | $14.50 | $217,500 |
|  |  | 12/1/2000 | 15,000 | $17.08 | $256,200 |
|  |  | 12/7/2000 | 30,000 | $16.66 | $499,800 |
|  |  | 12/8/2000 | 1,500 | $16.66 | $24,990 |
|  |  | 10/9/2001 | 37,500 | $18.66 | $699,750 |
|  |  | 10/16/2001 | 37,500 | $19.33 | $724,875 |
|  |  | 3/1/2004 | 41,625 | $22.00 | $915,749 |
|  |  | 8/19/2005 | 30,000 | $27.05 | $811,500 |
|  |  | 2/14/2006 | 7,700 | $33.25 | $256,025 |
|  |  | 3/17/2006 | 12,300 | $33.25 | $408,975 |
|  |  |  | **273,125** |  | **$5,408,462** |
|  |  |  |  |  |  |
| LOCKWOOD | STEPHEN | 12/23/1997 | 75,000 | $14.58 | $1,093,499 |
|  |  | 12/24/1997 | 11,400 | $14.34 | $163,476 |
|  |  | 12/26/1997 | 4,200 | $14.33 | $60,186 |
|  |  | 12/29/1997 | 25,050 | $14.33 | $358,966 |
|  |  | 12/30/1997 | 109,350 | $14.06 | $1,537,460 |
|  |  | 11/16/1998 | 21,300 | $12.66 | $269,658 |
|  |  | 11/17/1998 | 11,550 | $12.66 | $146,223 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|------------|------|--------|-------|----------|
| | | 11/18/1998 | 10,500 | $12.66 | $132,930 |
| | | 11/19/1998 | 90,150 | $12.54 | $1,130,480 |
| | | 11/25/1998 | 109,050 | $12.59 | $1,372,939 |
| | | 12/2/1998 | 37,500 | $12.25 | $459,375 |
| | | 12/3/1998 | 102,000 | $12.72 | $1,297,439 |
| | | 12/4/1998 | 18,600 | $12.67 | $235,662 |
| | | 12/7/1998 | 37,500 | $12.54 | $470,250 |
| | | 12/8/1998 | 202,500 | $12.38 | $2,506,949 |
| | | 12/11/1998 | 7,500 | $12.25 | $91,875 |
| | | 3/4/1999 | 7,500 | $11.33 | $84,975 |
| | | 3/4/1999 | 7,500 | $11.33 | $84,975 |
| | | 3/5/1999 | 7,500 | $11.42 | $85,650 |
| | | 3/8/1999 | 7,500 | $11.54 | $86,550 |
| | | 3/8/1999 | 750 | $11.54 | $8,655 |
| | | 3/9/1999 | 7,500 | $11.75 | $88,125 |
| | | 3/9/1999 | 1,200 | $11.75 | $14,100 |
| | | 3/10/1999 | 30,000 | $12.08 | $362,400 |
| | | 3/10/1999 | 7,500 | $12.08 | $90,600 |
| | | 3/10/1999 | 7,500 | $12.08 | $90,600 |
| | | 3/11/1999 | 15,000 | $12.08 | $181,200 |
| | | 3/11/1999 | 7,500 | $12.08 | $90,600 |
| | | 3/11/1999 | 7,500 | $12.08 | $90,600 |
| | | 3/11/1999 | 7,500 | $12.08 | $90,600 |
| | | 3/11/1999 | 3,883 | $12.08 | $46,913 |
| | | 3/15/1999 | 112,500 | $12.42 | $1,397,249 |
| | | 3/17/1999 | 45,000 | $12.46 | $560,700 |
| | | 3/18/1999 | 31,500 | $12.53 | $394,695 |
| | | 3/19/1999 | 22,500 | $12.42 | $279,450 |
| | | 3/22/1999 | 77,850 | $12.02 | $935,757 |
| | | 3/22/1999 | 10,950 | $12.02 | $131,619 |
| | | 3/23/1999 | 15,000 | $12.00 | $180,000 |
| | | 3/24/1999 | 52,500 | $11.83 | $621,075 |
| | | 3/26/1999 | 61,350 | $11.82 | $725,157 |
| | | 5/17/1999 | 375,000 | $14.33 | $5,373,747 |
| | | 6/19/2000 | 9,300 | $12.74 | $118,482 |
| | | 6/21/2000 | 75,000 | $12.70 | $952,499 |
| | | 6/26/2000 | 268,500 | $12.52 | $3,361,618 |
| | | 6/27/2000 | 119,700 | $12.66 | $1,515,401 |
| | | 11/21/2000 | 480,000 | $15.96 | $7,660,796 |
| | | 11/22/2000 | 63,657 | $15.67 | $997,505 |
| | | 6/8/2001 | 825,000 | $16.23 | $13,389,743 |
| | | 10/12/2001 | 375,000 | $18.66 | $6,997,496 |
| | | 3/19/2002 | 175,350 | $18.68 | $3,275,536 |
| | | 3/21/2002 | 2,850 | $18.68 | $53,238 |
| | | 3/22/2002 | 23,100 | $18.66 | $431,046 |
| | | 3/27/2002 | 67,950 | $18.66 | $1,267,946 |
| | | 3/28/2002 | 21,150 | $18.66 | $394,659 |
| | | | **4,309,688** | | **$63,839,320** |
| | | | | | |
| MARTIN | CHRISTOPHER | 12/7/2000 | 17,500 | $16.35 | $286,133 |
| | | 5/31/2002 | 17,050 | $18.00 | $306,909 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|-------:|------:|---------:|
| | | 5/31/2002 | 450 | $18.03 | $8,113 |
| | | 5/12/2003 | 15,999 | $19.17 | $306,701 |
| | | 5/27/2004 | 13,200 | $21.83 | $288,156 |
| | | 5/27/2004 | 300 | $21.90 | $6,570 |
| | | 2/25/2005 | 66,000 | $24.90 | $1,643,399 |
| | | 11/11/2005 | 20,706 | $32.66 | $676,258 |
| | | | **151,206** | | **$3,522,238** |
| | | | | | |
| MOLBECK | JOHN | 11/13/2000 | 75,000 | $14.96 | $1,121,999 |
| | | 11/21/2000 | 72,000 | $16.00 | $1,151,999 |
| | | 8/10/2001 | 49,999 | $16.67 | $833,491 |
| | | 8/10/2001 | 30,000 | $16.67 | $500,100 |
| | | 8/10/2001 | 25,999 | $16.67 | $433,411 |
| | | 8/10/2001 | 24,000 | $16.67 | $400,080 |
| | | 8/10/2001 | 24,000 | $17.93 | $430,320 |
| | | 8/10/2001 | 20,910 | $16.67 | $348,569 |
| | | 8/10/2001 | 9,090 | $16.67 | $151,530 |
| | | 1/2/2002 | 159,999 | $18.16 | $2,905,580 |
| | | | **490,998** | | **$8,277,080** |
| | | | | | |
| NAGJI | FARID | 8/8/2006 | 12,000 | $32.15 | $385,800 |
| | | | **12,000** | | **$385,800** |
| | | | | | |
| SCHELL | MICHAEL | 2/28/2005 | 70,650 | $25.10 | $1,773,314 |
| | | 2/28/2005 | 1,800 | $25.13 | $45,234 |
| | | 2/28/2005 | 1,350 | $25.12 | $33,912 |
| | | 2/28/2005 | 750 | $25.10 | $18,825 |
| | | 2/28/2005 | 300 | $25.12 | $7,536 |
| | | 2/28/2005 | 150 | $25.11 | $3,766 |
| | | 2/13/2006 | 75,000 | $33.00 | $2,475,000 |
| | | | **150,000** | | **$4,357,586** |
| | | | | | |
| SMITH | PETER | 12/23/1997 | 75,000 | $14.58 | $1,093,499 |
| | | 5/27/1999 | 33,208 | $14.49 | $481,191 |
| | | 5/27/1999 | 21,060 | $14.49 | $305,159 |
| | | 5/27/1999 | 14,062 | $14.49 | $203,765 |
| | | 5/27/1999 | 6,669 | $14.16 | $94,433 |
| | | | **150,000** | | **$2,178,048** |
| | | | | | |
| WAY | STEPHEN | 11/14/2000 | 330,000 | $15.07 | $4,973,097 |
| | | 11/14/2000 | 150,000 | $15.16 | $2,273,999 |
| | | 11/15/2000 | 150,000 | $15.08 | $2,261,999 |
| | | 11/15/2000 | 109,500 | $15.04 | $1,646,879 |
| | | 11/15/2000 | 3,000 | $15.04 | $45,120 |
| | | 12/19/2001 | 185,100 | $18.73 | $3,466,921 |
| | | 12/21/2001 | 83,100 | $18.80 | $1,562,279 |
| | | 12/21/2001 | 2,550 | $18.40 | $46,920 |
| | | 12/24/2001 | 4,200 | $18.50 | $77,700 |
| | | 12/27/2001 | 105,000 | $18.14 | $1,904,699 |
| | | 12/28/2001 | 150,450 | $18.21 | $2,739,693 |
| | | 12/31/2001 | 50,850 | $18.04 | $917,333 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 4/9/2002 | 156,000 | $18.74 | $2,923,439 |
| | | 4/10/2002 | 75,000 | $18.84 | $1,412,999 |
| | | 4/11/2002 | 61,050 | $18.79 | $1,147,129 |
| | | 4/12/2002 | 22,500 | $18.70 | $420,750 |
| | | 4/16/2002 | 106,650 | $18.59 | $1,982,622 |
| | | 4/17/2002 | 105,150 | $18.61 | $1,956,840 |
| | | 4/18/2002 | 2,250 | $18.66 | $41,985 |
| | | 4/19/2002 | 5,850 | $18.53 | $108,400 |
| | | 6/26/2003 | 193,200 | $19.91 | $3,846,610 |
| | | 6/27/2003 | 63,300 | $19.91 | $1,260,302 |
| | | 6/30/2003 | 3,450 | $19.93 | $68,758 |
| | | 7/2/2003 | 105,600 | $19.96 | $2,107,775 |
| | | 8/8/2003 | 241,800 | $20.74 | $5,014,929 |
| | | 8/13/2003 | 37,500 | $20.76 | $778,500 |
| | | 12/3/2003 | 403,500 | $21.22 | $8,562,266 |
| | | 12/4/2003 | 44,883 | $21.13 | $948,377 |
| | | 6/2/2004 | 37,500 | $22.36 | $838,500 |
| | | 6/9/2004 | 75,000 | $22.12 | $1,658,999 |
| | | 6/10/2004 | 105,000 | $22.11 | $2,321,549 |
| | | 7/2/2004 | 156,750 | $22.33 | $3,500,226 |
| | | 2/16/2005 | 206,250 | $24.38 | $5,028,372 |
| | | 2/17/2005 | 243,750 | $24.34 | $5,932,872 |
| | | 2/17/2005 | 7,500 | $24.60 | $184,500 |
| | | 2/18/2005 | 292,500 | $24.45 | $7,151,621 |
| | | 3/1/2005 | 180,300 | $25.50 | $4,597,647 |
| | | 3/2/2005 | 76,650 | $25.38 | $1,945,376 |
| | | 5/24/2005 | 300,000 | $40.40 | $12,119,994 |
| | | 8/3/2005 | 153,437 | $28.48 | $4,369,886 |
| | | 8/4/2005 | 118,000 | $27.79 | $3,279,220 |
| | | 3/29/2006 | 47,500 | $34.66 | $1,646,350 |
| | | 3/30/2006 | 100,000 | $34.40 | $3,440,000 |
| | | 3/31/2006 | 202,500 | $34.61 | $7,008,525 |
| | | | **5,254,067** | | **$119,521,957** |
| | | | | | |
| WILCOX | BENJAMIN | 5/16/2001 | 60,000 | $16.79 | $1,007,399 |
| | | 5/16/2001 | 49,999 | $16.79 | $839,491 |
| | | 1/4/2002 | 49,999 | $17.94 | $896,990 |
| | | 3/5/2002 | 22,650 | $18.64 | $422,196 |
| | | 3/6/2002 | 7,350 | $18.50 | $135,975 |
| | | | **189,999** | | **$3,302,052** |
| | | **Total:** | **13,082,165** | | **$252,588,986** |

59.     On August 14, 2006, HCC filed a Form 8-K with the SEC announcing an independent internal review of the Company's historical stock option granting practices.

60.     On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock option review had not been completed.  Then, on November 17, 2006, HCC filed a Form 8-K with the SEC, stating as follows:

> HCC Insurance Holdings, Inc. announced today the results of the Company's independent investigation of its historical stock option granting practices and certain changes in its executive management.
>
> The Company has substantially completed its previously announced independent investigation of the Company's stock option granting practices during the period of 1995 through the present. This comprehensive investigation was conducted by members of the Audit Committee, acting as an independent special committee of the Board of Directors (the "Special Committee"), with the assistance of Skadden, Arps, Slate, Meagher & Flom, LLP as independent legal counsel to the Special Committee and LECG as forensic accountants.
>
> The investigation has concluded that the Company used incorrect measurement dates for certain stock option grants covering a significant number of employees during the period from 1995 through 2006. The Company and the Special Committee are working with their advisors to determine the appropriate measurement dates and assess the related financial effects. LECG currently estimates the cumulative pre-tax financial impact of recording additional non-cash charges associated with stock option grants is not likely to exceed $37 million spread over the vesting periods of the options in question. The Company expects that the errors will require some increased tax provision. The Company is currently evaluating LECG's estimate for the financial impact and the related tax impact. Upon completion of this evaluation, the Company will determine whether a restatement of certain previously filed financial statements will be required.
>
> The Company intends to continue cooperating with the SEC in connection with its informal inquiry into this matter.

61.     In effect, during the relevant period, the Defendants caused HCC's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed HCC to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; (iii) that the Company's public disclosures

- 36 -

presented an inflated view of HCC's earnings and earnings per share; and (iv) that stock options were being granted and priced in violation of HCC's stock option plans.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.     Plaintiffs bring this action derivatively in the right and for the benefit of HCC to redress injuries suffered and to be suffered by HCC as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

63.     Plaintiffs will adequately and fairly represent the interests of HCC and its shareholders in enforcing and prosecuting its rights.

64.     Plaintiffs are owners of HCC stock and were owners of HCC stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

65.     Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the HCC Board of Directors to institute this action against the officers and members of the HCC Board of Directors is excused as futile.  All of  HCC's directors as of the lawsuit's filing knowingly received backdated stock options, all but two exercised their backdated options, all approved false and misleading SEC filings, and all approved at least one backdated grant.

### Severely Disabled HCC Board of Directors as of Lawsuit Filing

| Defendant Director | Board Tenure | *Received and Exercised* Backdated Options | Engaged in Backdating Options | Signed and/or Approved False & Misleading SEC Filings in Relevant Period | Worked on Compensation and/or Audit Committee in Relevant Period | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| Way | 1974-11/2006 | √ | √ | √ (1996-2006) | Chairman of the Board 1995-2006 | $119 MM |
| Bramanti | 1980-filing | √ | | √ (1996-2006) | | $20.5MM |
| Collins | 1993- | √ | √ | √ (1996-2006) | Compensation: 1995-1997 | $1.4MM |

| Defendant Director | Board Tenure | *Received and Exercised* Backdated Options | Engaged in Backdating Options | Signed and/or Approved False & Misleading SEC Filings in Relevant Period | Worked on Compensation and/or Audit Committee in Relevant Period | Insider Trading Proceeds |
|---|---|---|---|---|---|---|
| | filing | | | | Audit: 1995-2006 | |
| Crane | 1999-filing | √ | √ | √ (2000-2006) | Compensation: 2000-2006 | $3.1MM |
| Dickerson | 1981-filing | √ | √ | √ (1996-2006) | Compensation: 1995-1999 Audit: 1995-2004 | $1.3MM |
| Roberts | 2002-filing | √ (received) | √ | √ (2003-2006) | Compensation: 2003-2006 | |
| Duer | 2004-filing | √ (received) | | √ (2005-2006) | Audit: 2005-2006 | |
| Ellis | 2001-filing | √ | | √ (2001-2006) | | $5.3MM |
| Flagg | 2001-filing | √ | | √ (2001-2006) | Audit: 2001-2006 | $1.2MM |
| Fulkerson | 1997-filing | √ | | √ (1997-2006) | | $2 MM |
| Molbeck | 1997-filing | √ | | √ (1998-2006) | | $8.2MM |

66.     A pre-filing demand would be a useless and futile act because:

(a)     The members of HCC's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)     The HCC Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from HCC's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper

stock option grants and financial reporting. Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to HCC and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the HCC Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)      The acts complained of constitute violations of the fiduciary duties owed by HCC's officers and directors and these acts are incapable of ratification.

(d)      The members of HCC's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)      Any suit by the current directors of HCC to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)      HCC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for HCC any part of the damages HCC suffered and will suffer thereby.

(g)       In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)       HCC's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of HCC. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by HCC against these Defendants, known as, *inter alia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of HCC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i)       In order to bring this action for breaching their fiduciary duties, the members of the HCC Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

67.       Plaintiffs have not made any demands on shareholders of HCC to institute this action since such demand would be a futile and useless act for the following reasons:

(a)       HCC is a publicly traded company with approximately 111.1 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**HCC's Stock Option Plans Authorized by the Shareholders**

68.     At all relevant times HCC granted stock options pursuant to its stock option plans in effect during 1995-2006, including: (i) the 1995 Flexible Incentive Plan (original and amended) ("1995 Plan"); (ii) the 1994 Non-Employee Director Stock Option Plan ("1994 NED Plan"); (iii) the 1996 Non-Employee Director Stock Option Plan (original and amended) ("1996 NED Plan"); (iv) the 1997 Flexible Incentive Plan (original and amended) ("1997 Plan"); (v) the 2001 Flexible Incentive Plan (original and amended) ("2001 Plan"); and (vi) the 2004 Flexible Incentive Plan ("2004 Plan").

69.     A fundamental requirement of HCC's stock option plans is and always was that "the option exercise price of an Incentive Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of Shares on the date of the grant." *See for example* 1994 Plan, §6.2; 1996 NED Plan, §5; 1997 Plan, §6.2; 2001 Plan, §6.2; 2004 Plan, §6.2.  This fundamental requirement directly contradicts dating a stock option on a date prior to its grant.  Nonetheless, the Way and the Compensation Committees over the years repeatedly approved stock options which on their face were backdated.

**Certain Alleged Backdated Stock Option Grants**

| Purported Option Grant | Price | Directors & Officers Who Received Grant | Number of Options Received | Options Exercised, Stock Sold | Defendant Directors and Officers Who Engaged In Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| 12/13/95 | $30.75[1] | Collins | 1,333 | √ | Collins, Dickerson, Way, Wilson |
| | | Dickerson | 1,333 | | |
| | | Frank | 1,333 | | |
| | | Lack | 1,333 | √ | |
| | | Way | 125,000 | √ | |
| | | Wilson | 1,333 | | |
| 10/31/96 | $25.75 | Way | 250,000 | | Collins, Dickerson, Way, Wilson |
| 01/02/97 | $22.50 | Bramanti | 30,000 | √ | Collins, Dickerson, Way, Wilson |
| | | Smith | 45,000 | | |
| | | Way | 387,500 | √ | |
| 08/19/97 | $25.50 | Martin | 50,000 | √ | Collins, Dickerson, Way, Wilson |
| 12/01/97 | $18.88 | Collins | 5,000 | √ | Collins, Dickerson, Way, Wilson |
| | | Dickerson | 5,000 | | |
| | | Fulkerson | 5,000 | √ | |
| | | Lack | 5,000 | √ | |
| | | Wilson | 12,500 | | |
| 01/07/98 | $16.50 | Bramanti | 166,667 | √ | Lack, Dickerson, Way, Wilson |
| | | Ellis | 10,000 | √ | |
| | | Frank | 5,000 | | |
| | | Lockwood | 200,000 | | |
| | | Martin | 5,000 | | |
| | | Molbeck | 400,000 | √ | |
| | | Smith | 125,000 | | |
| | | Way | 450,000 | √ | |
| 12/17/98 | $17.31 | Collins | 10,000 | √ | Lack, Dickerson, Way, Wilson |
| | | Dickerson | 10,000 | | |
| | | Frank | 10,000 | | |
| | | Fulkerson | 10,000 | √ | |
| | | Lack | 10,000 | √ | |
| | | Wilson | 10,000 | | |
| 12/31/98 | $17.75 | Bramanti | 16,667 | √ | Lack, Dickerson, Way, Wilson |
| | | Ellis | 25,000 | | |
| | | Lockwood | 50,000 | | |
| | | Molbeck | 50,000 | | |
| | | Way | 150,000 | | |
| 02/12/99 | $16.38 | Martin | 20,000 | √ | Dickerson, Frank, Lack, Way |
| | | Way | 200,000 | √ | |
| 12/06/99 | $10.63 | Martin | 35,000 | √ | Dickerson, Frank, Lack, Way |
| 01/05/2000 | $12.06 | Bramanti | 100,000 | √ | Crane, Frank, Lack, Way |
| | | Bush | 31,667 | √ | |
| | | Collins | 15,000 | √ | |
| | | Crane | 37,500 | √ | |
| | | Dickerson | 1,000 | √ | |

---

[1]      This backdated option was backdated after a 5-for-2 stock split by HCC on 05/15/96.  Many of these options appear in Form 4s after that split date and are priced at $12.30.

- 42 -

| Purported Option Grant | Price | Directors & Officers Who Received Grant | Number of Options Received | Options Exercised, Stock Sold | Defendant Directors and Officers Who Engaged In Backdating the Purported Stock Option Grant |
|---|---|---|---|---|---|
| | | Ellis | 75,000 | √ | |
| | | Frank | 10,000 | | |
| | | Fulkerson | 33,333 | √ | |
| | | Lack | 10,000 | √ | |
| | | Lockwood | 10,000 | √ | |
| | | Molbeck | 200,000 | √ | |
| | | Wilcox | 100,000 | √ | |
| 01/16/2001 | $20.50 | Bush | 20,000 | | Bush, Crane, Lack, Way |
| | | Collins | 10,000 | √ | |
| | | Crane | 10,000 | √ | |
| | | Dickerson | 10,000 | | |
| | | Fulkerson | 10,000 | √ | |
| | | Lack | 10,000 | √ | |
| | | Lockwood | 10,000 | | |
| 03/29/01 | $24.00 | Flagg | 19,999 | √ | Bush, Crane, Lack, Way |
| 01/24/2002 | $25.20 | Bramanti | 12,500 | √ | Bush, Crane, Lack, Way |
| | | Bush | 25,000 | | |
| | | Collins | 12,500 | | |
| | | Crane | 12,500 | √ | |
| | | Dickerson | 12,500 | | |
| | | Ellis | 100,000 | √ | |
| | | Frank | 12,500 | | |
| | | Fulkerson | 12,500 | | |
| | | Kelbel | 100,000 | √ | |
| | | Lack | 12,500 | √ | |
| | | Martin | 15,000 | √ | |
| 07/18/02 | $20.96 | Schell | 194,693 | √ | Bush, Crane, Lack, Way |
| 07/22/02 | $29.20 | Ellis | 25,000 | | Bush, Crane, Lack, Way |
| | | Way | 1,333,350 | √ | |
| 08/26/04 | $29.20 | Duer | 25,000 | | Crane, Lack, Roberts, Way |
| 12/20/04 | $32.00 | Bramanti | 12,500 | | Crane, Lack, Roberts, Way |
| | | Bush | 10,000 | | |
| | | Collins | 12,500 | | |
| | | Crane | 12,500 | | |
| | | Dickerson | 12,500 | | |
| | | Duer | 12,500 | | |
| | | Flagg | 12,500 | | |
| | | Fulkerson | 12,500 | | |
| | | Lack | 12,500 | | |
| | | Roberts | 12,500 | | |
| 07/22/05 | $25.88 | Nagji | 75,000 | | Crane, Lack, Roberts, Way |
| | | Way | 600,000 | | |

70.     The chart above reflects the number and price of options unadjusted for stock splits.

HCC effected a 5-for-2 stock split on May 15, 1996 and a 3-for-2 stock split on July 20, 2005.  In

many instances, Defendants exercised their stock options *after* a stock split and obtained

significantly more shares of HCC stock at a lower price than the exercise price as a result of the stock split.  Also, in some instances there is evidence that stock option grants were determined *after* a stock split and then backdated to *before* the stock split.  This effectively granted significantly more stock derivatively owned than what was stated on the option grant, and also effectively granted the options at an even lower exercise price than what was stated.  The effect of the stock splits was huge.  For example, option quantities above reflecting 1,333 options split to 5000 options, 10,000 split to 15,000, 20,000 split to 30,000, 100,000 split to 150,000, and 200,000 split to 300,000.

71.    While members of HCC's Compensation Committee, Defendants Collins, Dickerson, Wilson, Lack, Frank, Crane, Bush and Roberts were the ones who had the responsibilities to "administer" the Company's stock option plans.  Those responsibilities have never been anything less than full responsibility, authority and discretion to determine and grant stock options as a committee.  And nobody else has ever held the shareholders' delegated authority to grant stock options.  *See for example* 1994 Plan, §3; 1997 Plan, §3; 2001 Plan, §3; 2004 Plan, §3.

72.    Abusing that authority, Defendants Collins, Dickerson, Wilson, Lack, Frank, Crane, Bush and Roberts (among other things): (i) backdated and mispriced stock options in violation of HCC's stock option plans; (ii) "informally" delegated option granting-related "authority" to Way in violation of HCC's stock option plans; (iii) approved backdated options suggested by Way; and (iv) in collusion with Way or otherwise determined and granted option awards dated with dates prior to, the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.  As HCC recently admitted, Martin, the Company's General Counsel, was aware of this conduct.  And so too was each Defendant – HCC's Board members and officers who received backdated options.  Each of these Defendants abused their authority in allowing the backdating and mispricing to occur without disclosure.

- 44 -

73.    An analytical review of the annual stock option grants to directors and officers of HCC between 1995-2005 reveals that stock option grants were often dated: (i) near or on the very day that HCC's stock price hit its low price for the month, quarter and/or year; and/or (ii) in advance of significant stock price increases.  Indeed, over one quarter of stock option grants to HCC's directors and officers came at monthly lows in HCC's share price.  The odds of that happening absent intentional manipulation are so extremely remote that backdating must have taken place.  And in fact the Company has now admitted to backdating:  "we . . . used incorrect accounting measurement dates for stock option grants covering a significant number of employees and members of our Board of Directors during the period 1997 through 2005" and during that period "certain stock option grants were retroactively priced."  The following describes some of the backdated and mispriced grants and their recipients.

**Option Grant Backdated and Retroactively Priced to December 13, 1995**

74.    This option was granted to Way and five additional members of the Board, three of whom worked on the Compensation Committee, Collins, Dickerson and Wilson.  It was dated and priced at HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 19.5% and 36.9%, respectively.



**Option Grant Backdated and Retroactively Priced to October 30, 1996**

75.     This option was granted to Way.  It was dated and priced near HCC's lowest closing

stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price

following that date were 7.7% and 7.3%, respectively.



- 46 -

**Option Grant Backdated and Retroactively Priced to January 2, 1997**

76.     This option was granted to Way, Smith and Bramanti.  It was dated and priced at HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 27.2%.



**Option Grant Backdated and Retroactively Priced to August 19, 1997**

77.     This option was granted to Martin.  On only three days during the month and fiscal quarter did HCC's stock price close lower than on the date for which this option was dated and priced.  The 10-day increase in HCC's stock price following that date was 6.4%.



**Option Grant Backdated and Retroactively Priced to December 1, 1997**

78.    This option was granted to five members of the Board, three of whom then constituted the Compensation Committee, Collins, Dickerson and Wilson.  On only four days during the month and eight days during the fiscal year did HCC's stock price close lower than on the date for which this option was dated and priced.  The 10- and 20-day increases in HCC's stock price following that date were 1.6% and 9.4%, respectively.



**Option Grant Backdated and Retroactively Priced to January 7, 1998**

79.     This option was granted to Way, Bramanti, Ellis, Frank, Lockwood, Martin, Molbeck, Smith.  On only four days during HCC's fiscal year did the Company's stock price close lower than on the date for which this option was dated and priced.  The 10- and 20-day increases in HCC's stock price following that date were 2.7% and 16.7%, respectively.



**Option Grant Backdated and Retroactively Priced to December 17, 1998**

80.     This option was granted to six members of the Board, including those who constituted the Compensation Committee, Lack, Dickerson and Wilson.  It was dated and priced near the lowest closing price for HCC's stock during that fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 4.6% and 15.7%, respectively.



**Option Grant Backdated and Retroactively Priced to December 31, 1998**

81.     This option was granted to Way, Bramanti, Ellis, Lockwood and Molbeck.  It was dated and priced at HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 12.1% and 10.7%, respectively.



**Option Grant Backdated and Retroactively Priced to February 12, 1999**

82.     This option was granted to Martin and Way.  It was dated and priced at HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 8.8% and 13.4%, respectively.



**Option Grant Backdated and Retroactively Priced to December 6, 1999**

83.     This option was granted to Martin.  On only two days during the month  and nine days during HCC's fiscal year did the Company's stock price close lower than on the date for which this option was dated and priced.  The 10- and 20-day increases in HCC's stock price following that date were 6.5% and 16.5%, respectively.



**Option Grant Backdated and Retroactively Priced to January 5, 2000**

84.     This option was granted to most of HCC's Board, including each member of the Compensation Committee.  It was dated and priced at HCC's lowest closing stock price for the month.  The 10- and 20-day increases in HCC's stock price following that date were 23.3% and 7.8%, respectively.



**Option Grant Backdated and Retroactively Priced to January 16, 2001**

85.     This option was granted to seven members of HCC's Board, including each member of the Compensation Committee.  It was dated and priced at HCC's lowest closing stock price for the month, fiscal quarter and fiscal year.  The 10- and 20-day increases in HCC's stock price following that date were 8.8% and 20.2%, respectively.



**Option Grant Backdated and Retroactively Priced to March 29, 2001**

86.     This option was granted to Flagg.  It was dated and priced at HCC's second lowest closing stock price for the month.  The 10- and 20-day increases in HCC's stock price following that date were 17.1% and 16.7%, respectively.



**Option Grant Backdated and Retroactively Priced to January 24, 2002**

87.    This option was granted to most of the members of HCC's Board, including each member of the Compensation Committee.  It was dated and priced at HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 3.6% and 13.1%, respectively.



**Option Grant Backdated and Retroactively Priced to July 18, 2002**

88.    This option was granted to Schell.  It was dated and priced at near HCC's lowest closing stock price for the month, fiscal quarter and fiscal year.  The 10- and 20-day increases in HCC's stock price following that date were 7.1% and 12.5%, respectively.



**Option Grant Backdated and Retroactively Priced to July 22, 2002**

89.     This option was granted to Way and Ellis.  It was dated and priced at HCC's second lowest closing stock price for the month, fiscal quarter and fiscal year.  The 10- and 20-day increases in HCC's stock price following that date were 1.9% and 19.3%, respectively.



**Option Grant Backdated and Retroactively Priced to August 26, 2004**

90.    This option was granted to Duer.  It was dated and priced at HCC's second lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 1% and 3.3%, respectively.



**Option Grant Backdated and Retroactively Priced to December 20, 2004**

91.    This option was granted to most of the members of HCC's Board, including each member of the Compensation Committee.  It was dated and priced at HCC's lowest closing stock price for the month.  The 10- and 20-day increases in HCC's stock price following that date were 3.3% and 2.4%, respectively.



## Option Grant Backdated and Retroactively Priced to July 22, 2005

92.     This option was granted to Way and Nagji.  It was dated and priced at near HCC's lowest closing stock price for the month and fiscal quarter.  The 10- and 20-day increases in HCC's stock price following that date were 6.7% and 4.6%, respectively.



93.    Way, Crane, Frank, Lack, Bush and Roberts also engaged in backdating other grants dated at or near the lowest closing price of HCC's stock for the month on other occasions.  Those grants included the following options dated at the lowest closing price of HCC's stock for the month: November 3, 2000 (Way, Crane, Frank and Lack); October 9, 2002 (Way, Bush, Crane and Lack); and February 19, 2004 (Way, Crane, Lack and Roberts).  The Company has also admitted in connection with its recent massive accounting restatement that backdating occurred in from 1994 through 1994 and in 2006 as well, having disclosed that it found "incorrect measurement dates due to retroactive pricing were used in 2006."  "In substantially all of these instances, the price on the actual measurement date was higher than the price on the stated grant date," HCC has admitted.

94.    The issuance of all of the options identified above violated HCC's stock option plans, which provided that the exercise price of options to purchase HCC's stock shall not be less than 100% of the fair market value on the date of grant.  As shown in the next three sections, it also contradicted HCC's statements in SEC filings and other reports to HCC's shareholders.  The secret practice of backdating stock option grants to themselves and their colleagues was in breach of Defendants' fiduciary duties, including their duties of good faith, honesty and loyalty, owed to HCC and its shareholders.

95.    The backdating, among other things, enabled Defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding them in-the-money options and to avoid having to expense the in-the-money portion as compensation expense and thus avoid reductions in the Company's net income.  Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to HCC that were less than they should have paid, had the options not been granted in-the-money.

96.     The scheme also conferred great personal financial benefits on Defendants.  Before the recent disclosures of Defendants' stock option backdating, HCC's stock traded at prices as high as $34.89 per share, propelled in large part by the admittedly false financial statements that Defendants had caused HCC to issue.  Indeed, HCC's stock price significantly increased in response to HCC's reported financial statements that overstated income, net income, and earnings per share as a result of the backdating.  While the price of HCC's stock was artificially inflated, Defendants engaged in a massive insider trading bailout, selling more than $252 million worth of HCC's stock in violation of securities laws.  When HCC began to disclose the backdating and its impact in fall-winter 2006, HCC's stock price significantly decreased in response.

97.     HCC's directors profited handsomely from the backdating.  The members of HCC's Compensation Committee alone during the period of backdating cashed in their options for approximately $10 million.  In all, the Board reaped well over $100 million from exercising hundreds of thousands of their options.

## HCC'S FALSE AND MISLEADING PROXY STATEMENTS

98.     In its Proxies the Company (and numerous Defendants) repeatedly communicated to HCC shareholders (i) that it was the Compensation Committee that was determining stock option grants pursuant to its authorization of the shareholders through HCC's stock option plans, and also no executive officer was performing those functions, (ii) that had been granting and would continue to grant stock options priced in accordance with HCC's stock option plans and at no less than fair market value at the date of grant, and (iii) that stock options were being granted prudently and consistent with the Company's compensation policies to compensate management through future growth in the Company's market value (*i.e.*, not by granting "in-the-money" stock options), among other things.

- 61 -

99.     But these statements (many of which are identified below) were materially false and misleading.   In truth, and as those who signed and approved HCC's Proxies knew, HCC's Compensation Committee: (i) backdated and mispriced stock options in violation of HCC's stock option plans; (ii) "informally" delegated option granting-related "authority" to Way in violation of HCC's stock option plans; (iii) approved backdated options suggested by Way; and (iv) in collusion with Way or otherwise determined and granted option awards dated with dates prior to, the dates the awards were properly authorized, employees were entitled to receive the options, or the option or price was known.

100.     By issuing false and misleading statements in HCC's Proxy Statements, the Defendants identified below were able to (i) increase the numbers of authorized shares of common stock of HCC from which Defendants could gain shares by exercise of their backdated stock options; (ii) gain the ability to grant to themselves and others backdated stock options; and (iii) obtain elected directorships enabling them to perpetuate the scheme.   Were the truth disclosed, HCC's shareholders would not have approved the proposals HCC's Board submitted for their approval in the Company's Proxy statements identified below.

**Proxy Statement Filed April 7, 1995**

101.     On April 7, 1995 HCC filed with the SEC its proxy statement for the annual meeting of shareholders held on May 18, 1995 ("1995 Proxy Statement").   The 1995 Proxy Statement was signed by Defendant Bramanti and reviewed and approved by (among others) Defendants Way, Bramanti, Smith, Collins, Dickerson, Frank, Lack, Lockwood, and Wilson.   The 1995 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Collins, Dickerson and Wilson.

102.     The 1995 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to

grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1995 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans."  1995 Proxy Statement at 6.  The Report of the Compensation Committee further stated that "grants under the Company's 1992 Option Plan" were "made solely by the committee." *Id*. at 11.  The 1995 Proxy Statement also represented that the Compensation Committee would "administer" the 1995 Flexible Incentive Plan ("1995 Flexible Incentive Plan" or "Flexible Plan") and with respect to stock options would "determine the number of shares subject to the option, the term of the option . . . the exercise price per share of stock subject to the option (which, for incentive stock options, [would] be not less than the fair market value of the common stock at the time of grant) . . . and the other material terms of the option."  *Id*. at 17-18.  The 1995 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same.  In so doing, the 1995 Proxy Statement (among other things) attached the Company's proposed 1995 Flexible Incentive Plan which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options.  *See* §§3, 5, 6.1-6.5, 7, 15.

(b)     The 1995 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, stock options that were granted during 1994.  It stated that during 1994 stock options "were granted to four executive officers, 17 other officers and six employees of subsidiaries of the Company," and that such "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by

management is beneficial in aligning management and shareholder interests in the enhancement of shareholder value." *Id*. at 11-12.  It also stated the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using those "long-term incentives" to "align management and shareholder interest and the enhancement of shareholder value," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.  The 1995 Proxy Statement also stated that under the Company's 1995 Flexible Incentive Plan, the Compensation Committee would "determine . . . the exercise price per share of stock subject to the option[s]" it granted at "not less than the fair market value of the common stock at the time of grant."  *Id*. at 18.  Supporting that representation, the proposed 1995 Flexible Incentive Plan was attached to the 1995 Proxy Statement and expressly incorporated by reference.  The 1995 Flexible Incentive Plan further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant of such incentive stock option[s]."  *Id*. at A-7.  This was stated in sum and substance throughout the 1995 Flexible Incentive Plan's provisions concerning stock option grants.

103.    The 1995 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL I" concerned the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

(b)    "PROPOSAL II" concerned increasing the number of shares of common stock authorized for issuance by the Company.  Each Defendant, a director at the time, explicitly recommended approval of this proposal:  "**The Board of Directors recommends that shareholders**

vote FOR the proposal to amend the Certificate of Incorporation of the Company to increase the number of authorized shares." *Id.* at 16.

(c)     "PROPOSAL III" concerned the 1995 Flexible Incentive Plan.  Each Defendant, a director at the time, recommended approval of the Plan:  "**The Board recommends a vote FOR the adoption of the 1995 Flexible Incentive Plan**." *Id.* at 21.

(d)     "PROPOSAL IV" concerned the Company's 1994 Non-Employee Director Stock Option Plan.  Each Defendant, a director at the time, recommended HCC's shareholders approve the Plan:  "**The Board of Directors recommends a vote FOR approval of the Director Plan** . . . ." *Id.* at 23.

**Proxy Statement filed April 20, 1996**

104.     On April 20, 1996 HCC filed with the SEC its proxy statement for the annual meeting of shareholders held on May 23, 1996 ("1996 Proxy Statement").  The 1996 Proxy Statement was signed by Defendant Bramanti and reviewed and approved by (among others) Defendants Way, Bramanti, Collins, Dickerson, Frank, Lack, Lockwood, Wilson, and Smith.  The 1996 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Collins, Dickerson and Wilson.

105.     The 1996 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1996 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's Shareholders" and "administers the Company's stock option plans."  1996 Proxy Statement at 6.  The Report of the Compensation Committee further

stated that "grants under the Company's 1992 Option Plan and the Flexible Plan" were "made solely by the Committee." *Id*. at 11. The 1996 Proxy Statement also represented that the Compensation Committee "administers" the 1995 Flexible Incentive Plan and with respect to stock options "determine[s] the number of shares subject to the option, the term of the option . . . the exercise price per share subject to the option (which, for incentive stock options, [is] not less than the fair market value of the common stock at the time of grant) . . . and the other material terms of the option." *Id*. at 18. The 1996 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same. In so doing, the 1996 Proxy Statement (among other things) attached the Company's proposed 1995 Flexible Incentive Plan (as amended) which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options. *See* §§3, 5, 6.1-6.5, 7, 15.

(b)     The 1996 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future. The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, stock options that were granted during 1995. It stated that during 1995 stock options "were granted to 5 executive officers, 30 other officers and 8 employees of the Company and its subsidiaries," and that such "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value." *Id*. at 11-12. It also stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and executive officers" with the "potential of capital gains," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value. *Id*. at 11. Thus, stock options were

not being backdated but rather were granted to incentivize the Company's management.  The 1996 Proxy Statement also stated that under the Company's 1995 Flexible Incentive Plan the Compensation Committee would "determine . . . the exercise price per share of stock subject to the option[s]" it granted at "not less than the fair market value of the common stock at the time of grant."  *Id*. at 18.  Supporting that representation, the proposed 1995 Flexible Incentive Plan (as amended) was attached to the 1996 Proxy Statement and expressly incorporated by reference.  The proposed amended 1995 Flexible Incentive Plan further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant of such incentive stock option[s]."  *Id*. at B-5.  This was stated in sum and substance throughout the amended 1995 Flexible Incentive Plan's provisions concerning stock option grants.

106.    The 1996 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL I" concerned the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

(b)    "PROPOSAL II" concerned increasing the number of shares of common stock authorized for issuance by the Company.  Each Defendant, a director at the time, explicitly recommended approval of this proposal:   "**The Board of Directors recommends that Shareholders vote FOR the proposal to amend the Certificate of Incorporation of the Company to increase the number of authorized shares**."  *Id*. at 15.

(c)    "PROPOSAL III" concerned the Company's 1996 Non-Employee Director Stock Option Plan.  Each Defendant, a director at the time, recommended that HCC's shareholders

approve the Plan: "**The Board of Directors recommends a vote FOR approval of the 1996 Non-Employee Director Stock Option Plan**." *Id*. at 17.

(d)     "PROPOSAL IV" concerned amendments to the 1995 Flexible Incentive Plan to double the number of shares of Common Stock for which options could be granted and to eliminate the limitation on the number of options that could be granted to certain officer Defendants. Each Defendant a director at the time recommended approval of the Plan: "***The Board of Directors recommends that Shareholders vote FOR the approval of the amendments to the 1995 Flexible Incentive Plan***." *Id*. at 21.

**Proxy Statement filed May 22, 1997**

107.     On May 22, 1997 HCC filed with the SEC its proxy statement for the 1997 annual meeting of shareholders ("1997 Proxy Statement").  The 1997 Proxy Statement was signed by Defendant Bramanti and reviewed and approved by (among others) Defendants Way, Bramanti, Collins, Dickerson, Frank, Fulkerson, Lack, Lockwood, Wilson and Smith.  The 1997 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Collins, Dickerson and Wilson.

108.     The 1997 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 1997 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans." 1997 Proxy Statement at 10.  It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent

functions." *Id.* The Report of the Compensation Committee further stated that "grants under the Company's 1992 Option Plan and the 1995 Flexible Incentive Plan" were "made solely by the committee." *Id.* at 15. The 1997 Proxy Statement also represented that the Compensation Committee "administers" the 1997 Flexible Incentive Plan and with respect to stock options "determine[s] the number of shares subject to the option, the term of the option . . . the exercise price per share subject to the option (which, for incentive stock options, [is] not less than the fair market value of the common stock at the time of grant) . . . and the other material terms of the option." *Id.* at 19. The 1997 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same. In so doing, the 1997 Proxy Statement (among other things) attached the Company's proposed 1997 Flexible Incentive Plan which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options. *See* §§3, 5, 6.1-6.5, 7, 15.

       (b)     The 1997 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future. The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, stock options that were being granted and were granted during 1996. It stated that during 1996 stock options "were granted to 8 Executive Officers, 54 other officers and 19 employees of the Company and its subsidiaries," and that such "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value." *Id.* at 16. It also stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers" with the "potential of capital gains," *i.e.*, by granting market value options that

would compensate management by future growth in the Company's market value.  *Id.* at 15.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.  The 1997 Proxy Statement also stated that under the Company's 1997 Flexible Incentive Plan the Compensation Committee "determine[s] . . . the exercise price per share of stock subject to the option[s]" it grants at "not less than the fair market value of the common stock at the time of grant."  *Id.* at 19.  Supporting that representation, the proposed 1997 Flexible Incentive Plan was attached to the 1997 Proxy Statement and expressly incorporated by reference.  The proposed 1997 Flexible Incentive Plan further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant of such incentive stock option[s]."  *Id.* at A-5. This was stated in sum and substance throughout the amended 1997 Flexible Incentive Plan's provisions concerning stock option grants.

109.    The 1997 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL I" concerned the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

(b)    "PROPOSAL II" concerned the Company's 1997 Flexible Incentive Plan. Each Defendant, a director at the time, recommended HCC's shareholders approve the Plan: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE APPROVAL OF THE 1997 FLEXIBLE INCENTIVE PLAN."  *Id.* at 21.

**Proxy Statement filed May 21, 1998**

110.    On May 21, 1998 HCC filed with the SEC its proxy statement for the 1998 annual meeting of shareholders ("1998 Proxy Statement").  The 1998 Proxy Statement was signed by

Defendant Martin and reviewed and approved by (among others) Defendants Way, Martin, Bramanti, Collins, Dickerson, Frank, Fulkerson, Lack, Lockwood, Molbeck, Wilson and Smith. The 1998 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Lack, Dickerson and Wilson.

111.    The 1998 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 1998 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans." 1998 Proxy Statement at 9. It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions." *Id.* The 1998 Proxy Statement also represented that the Compensation Committee "administers" the 1997 Flexible Incentive Plan and that stock option awards were "determined by the Committee" and the "specific amount of awards" was "in the discretion of the Committee." *Id.* at 18. The 1998 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same. In so doing, the 1997 Proxy Statement (among other things) attached the Company's proposed 1997 Flexible Incentive Plan (as amended) which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options. *See* §§3, 5, 6.1-6.5, 7, 15.

(b)    The 1998 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future. The Report of the Compensation

Committee discussed "long-term incentive compensation," *i.e.*, stock options that were being granted and were granted during 1997.  It stated that during 1997 stock options "were granted to the Named Executive Officers" and "98 other officers and employees of the Company," and that such "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value."  *Id*. at 13-14.  It also stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers" with the "potential of capital gains," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  *Id*. at 13.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.  Supporting that representation, the proposed 1997 Flexible Incentive Plan (as amended) was attached to the 1998 Proxy Statement and expressly incorporated by reference.  The 1997 Flexible Incentive Plan (as amended) further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant."  *Id*. at A-5.  This was stated in sum and substance throughout the amended 1997 Flexible Incentive Plan's provisions concerning stock option grants.

112.    The 1998 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL I" concerned the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.