(b)     "PROPOSAL II" concerned increasing the number of shares of common stock authorized for issuance by the Company to HCC's officers and directors "in connection with [the Company's] existing stock options plans."  *Id*. at 16.  Each Defendant, a director at the time, explicitly recommended approval of this proposal:   "THE  BOARD  OF  DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE PROPOSAL TO AMEND THE CERTIFICATE OF INCORPORATION OF THE COMPANY TO INCREASE THE NUMBER OF AUTHORIZED SHARES."  *Id*. at 16.

(c)     "PROPOSAL III" concerned amendments to the Company's 1997 Flexible Incentive Plan, and principally an amendment to "increase the number of shares of Common Stock for which options may be granted from 2,000,000 to 4,000,000."  *Id*. at 17.  Each Defendant a director at the time recommended HCC's shareholders approve the amendments to the Plan:  "THE BOARD  OF  DIRECTORS  RECOMMENDS  THAT  SHAREHOLDERS  VOTE  FOR  THE PROPOSAL TO AMEND THE 1997 FLEXIBLE INCENTIVE PLAN."  *Id*. at 18.

(d)     "PROPOSAL IV" concerned amendments to the Company's 1996 Non-Employee Director Stock Option Plan, and principally amendments to "increase the number of shares of Common Stock for which options may be granted from 250,000 to 450,000" and "to increase the annual grant of options to Nonemployee Directors from 5,000 to 10,000."  *Id*. at 19. Each Defendant a director at the time recommended that HCC's shareholders approve the amendments  to  the  Plan:   "THE  BOARD  OF  DIRECTORS  RECOMMENDS  THAT SHAREHOLDERS VOTE FOR THE PROPOSAL TO AMEND THE 1996 NONEMPLOYEE DIRECTOR STOCK OPTION PLAN."  *Id*. at 20.

**Proxy Statement filed May 20, 1999**

113.    On May 20, 1999, HCC filed with the SEC its proxy statement for the 1999 annual meeting of shareholders ("1999 Proxy Statement").  The 1999 Proxy Statement was signed by

Defendant Martin and reviewed and approved by (among others ) Defendants Way, Martin, Bramanti, Bush, Collins, Crane, Dickerson, Frank, Fulkerson, Lack, Lockwood, Molbeck and Smith. The 1999 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Frank, Lack and Dickerson.

114.    The 1999 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 1999 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans."  1999 Proxy Statement at 9.  It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions."  *Id.*

(b)    The 1999 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, the granting of stock options.  It stated that "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value."  *Id*. at 17.  It also stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers," *i.e.*, by granting market value options that would compensate management by

- 74 -

future growth in the Company's market value.  *Id.* at 19.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.

115.    The 1999 Proxy Statement representations were made in connection with and essential to the proposal of HCC's Board concerning the vote for the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

**Proxy Statement filed May 18, 2000**

116.    On May 18, 2000, HCC filed with the SEC its proxy statement for the 2000 annual meeting of shareholders ("2000 Proxy Statement").  The 2000 Proxy Statement was signed by Defendant Martin and reviewed and approved by (among others) Defendants Way, Martin, Bramanti, Bush, Collins, Crane, Dickerson, Frank, Fulkerson, Lack, Lockwood and Molbeck.  The 2000 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Crane, Frank and Lack.

117.    The 2000 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2000 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans."  2000 Proxy Statement at 8.  It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing similar functions."  *Id.* at 9.

(b)      The 2000 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, the granting of stock options.  It stated that "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value."  *Id*. at 16.  It also stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  *Id*. at 15.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.

118.    The 2000 Proxy Statement representations were made in connection with and essential to the proposal of HCC's Board concerning the vote for the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

**Proxy Statement filed May 24, 2001**

119.    On May 24, 2001 HCC filed with the SEC its proxy statement for the 2001 annual meeting of shareholders ("2001 Proxy Statement").  The 2001 Proxy Statement was signed by Defendant Martin and reviewed and approved by (among others) Defendants Way, Martin, Crane, Dickerson, Flagg, Frank, Lockwood, Bramanti, Collins, Ellis, Molbeck, Bush, Fulkerson and Lack.  The 2001 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Bush, Crane and Lack.

120.    The 2001 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to

grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2001 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for senior management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans." 2001 Proxy Statement at 11.  It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing similar functions."  *Id.*  The 2001 Proxy Statement also represented that the Compensation Committee "administers" the 2001 Flexible Incentive Plan ("2001 Flexible Plan" or "2001 Flexible Incentive Plan") and that stock option awards were "determined by the Compensation Committee" and the "specific amount of awards" was "in the discretion of the Compensation Committee." *Id.* at 24.  The 2001 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same.  In so doing, the 2001 Proxy Statement (among other things) attached the Company's proposed 2001 Flexible Incentive Plan which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options.  *See* §§3, 5, 6.1-6.5, 7, 15.

(b)     The 2001 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, stock options that were being granted and were granted during 2000.  It stated that such "longer-term incentives are appropriate to motivate and retain key personnel and that stock ownership by management is beneficial in aligning management and Shareholder interests in the enhancement of Shareholder value." *Id.* at 18.  It also stated that the Compensation Committee was granting stock options in accordance with the

Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value. *Id*. at 17. Thus, stock options were not being backdated but rather were granted to incentivize the Company's management. Supporting that representation, the proposed 2001 Flexible Incentive Plan was attached to the 2001 Proxy Statement and expressly incorporated by reference. The 2001 Flexible Incentive Plan further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant." *Id*. at 36. This was stated in sum and substance throughout the 2001 Flexible Incentive Plan's provisions concerning stock option grants.

121.    The 2001 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)    "PROPOSAL I" concerned the establishment of a classified Board of Directors containing the directors nominated – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders. Each Defendant a director at the time explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE PROPOSAL TO AMEND THE COMPANY'S AMENDED RESTATED CERTIFICATE OF INCORPORATION TO ESTABLISH A CLASSIFIED BOARD OF DIRECTORS." *Id*. at 5.

(b)    "PROPOSAL II" concerned the election of HCC's directors – again, many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders. Each Defendant a director at the time explicitly recommended approval of this proposal: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" EACH OF THE PROPOSED NOMINEES." *Id*. at 9.

(c)     "PROPOSAL III" concerned the Company's 2001 Flexible Incentive Plan. Each Defendant a director at the time recommended HCC's shareholders approve the Plan: "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE PROPOSAL TO APPROVE THE ADOPTION OF THE 2001 FLEXIBLE INCENTIVE PLAN." *Id*. at 22.

**Proxy Statement filed May 23, 2002**

122.    On May 23, 2002 HCC filed with the SEC its proxy statement for the 2002 annual meeting of shareholders ("2002 Proxy Statement"). The 2002 Proxy Statement was signed by Defendant Martin and reviewed and approved by (among others) Defendants Way, Martin, Bramanti, Bush, Crane, Collins, Dickerson, Ellis, Flagg, Frank, Fulkerson, Lack and Molbeck. The 2002 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Bush, Crane and Lack.

123.    The 2002 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2002 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for senior management employees for consistency of corporate objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans." 2002 Proxy Statement at 7. It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing similar functions." *Id.* The 2002 Proxy Statement also represented that the Compensation Committee "administers" the 2001 Flexible Incentive Plan and that stock option awards were "determined by the Compensation Committee" and the "specific amount of awards"

was "in the discretion of the Compensation Committee." *Id*. at 18.  The 2002 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same.  In so doing, the 2002 Proxy Statement (among other things) attached the Company's proposed 2001 Flexible Incentive Plan (as amended) which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options.  *See* §§3, 5, 6.1-6.5, 7, 15.

(b)    The 2002 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation," *i.e.*, stock options that were being granted and were granted during 2001.  It stated that the Compensation Committee was granting stock options in accordance with the Company's stock option plans by using incentive stock options to "instill shareholder considerations and values in the actions of all the employees and Executive Officers," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value. *Id*. at 14.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.  Supporting that representation, the proposed 2001 Flexible Incentive Plan (as amended) was attached to the 2002 Proxy Statement and expressly incorporated by reference.  The 2001 Flexible Incentive Plan (as amended) further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the fair market value of [HCC's stock] on the date of the grant." *Id*. at 25.  This was stated in sum and substance throughout the amended 2001 Flexible Incentive Plan's provisions concerning stock option grants.

124.    The 2002 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)      "PROPOSAL I" concerned the election of HCC's directors – again, many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.   Each Defendant a director at the time explicitly recommended approval of this proposal:  "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" EACH OF THE PROPOSED NOMINEES."  *Id*. at 5.

(b)      "PROPOSAL II" concerned an amendment to the Company's 2001 Flexible Incentive Plan to "increase[] the number of shares of Common Stock for which options may be granted from 3,000,000 to 5,500,000."  *Id*. at 20.   Each Defendant a director at the time recommended HCC's shareholders approve the amendment to the Plan:  "THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE PROPOSAL TO APPROVE THE AMENDMENTS TO THE 2001 FLEXIBLE INCENTIVE PLAN."  *Id*. at 18.

**Proxy Statement filed May 15, 2003**

125.    On May 15, 2003, HCC filed with the SEC its proxy statement for the 2003 annual meeting of shareholders ("2003 Proxy Statement").  The 2003 Proxy Statement was signed by Defendant Martin and reviewed and approved by Defendants Way, Martin, Bramanti, Collins, Crane, Dickerson, Ellis, Flagg, Fulkerson, Lack, Roberts and Bush.  The 2003 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Crane, Lack and Roberts.

126.    The 2003 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)      The 2003 Proxy Statement represented that the Compensation Committee "monitors compensation arrangements for management employees for consistency of corporate

objectives with the interests of the Company's shareholders" and "administers the Company's stock option plans." 2003 Proxy Statement at 7. It also stated "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions." *Id*.

       (b)    The 2003 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future. The Report of the Compensation Committee discussed "long-term incentive compensation" of the Company's executives, including the granting of stock options. It stated that the Compensation Committee had been using stock option awards to "reward Executive Officers and to retain them through the potential of capital gains and equity buildup in the Company," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value. *Id*. at 14. The Report of the Compensation Committee further stated that the use of "stock options represents an effective incentive to create value for the Shareholders." *Id*. Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.

    127.    The 2003 Proxy Statement representations were made in connection with and essential to the proposal of HCC's Board concerning the vote for the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

**Proxy Statement filed May 13, 2004**

    128.    On May 13, 2004 HCC filed with the SEC its proxy statement for the 2004 annual meeting of shareholders ("2004 Proxy Statement"). The 2004 Proxy Statement was signed by Defendant Martin and reviewed and approved by Defendants Way, Martin, Bramanti, Collins, Crane, Dickerson, Ellis, Flagg, Fulkerson, Lack, Roberts and Bush. The 2004 Proxy Statement also

contained a "Report of the Compensation Committee" signed by Defendants Crane, Lack and Roberts.

129.    The 2004 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2004 Proxy Statement represented that the Compensation Committee "has the responsibility for assuring that the senior executives of the Company are compensated in a manner consistent with the compensation philosophy and strategy of the Board and in compliance with the requirements of the regulatory bodies that oversee the Company's operations." 2004 Proxy Statement at 10.  The 2004 Proxy Statement also represented that the Compensation Committee "administers the Company's flexible incentive plans and other stock-based plans," and that "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions."  *Id.*   It further specifically stated the Compensation Committee "administers" the 2004 Flexible Incentive Plan ("Plan" or "2004 Flexible Incentive Plan") and that stock option awards were "determined by the Compensation Committee" and the "specific amount of awards" was "in the discretion of the Compensation Committee." *Id.* at 25.  The 2004 Proxy Statement repeatedly represented that the Compensation Committee was the holder of the authority and discretion to grant and price stock options and make recommendations concerning the same.  In so doing, the 2004 Proxy Statement (among other things) attached and expressly incorporated by reference the Company's proposed 2004 Flexible Incentive Plan which contained numerous provisions authorizing only the Compensation Committee to grant and price stock options.  *See* §§3, 5, 6.1-6.5, 7, 15.

(b)  The 2004 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation" of the Company's executives, including the granting of stock options.  It stated that the Compensation Committee had been using stock option awards to "reward Executive Officers and to retain them through the potential of capital gains and equity buildup in the Company," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  *Id*. at 21.  The Report of the Compensation Committee further stated that the use of "stock options represents an effective incentive to create value for the Shareholders."  *Id*.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.  The 2004 Proxy Statement also stated that under the 2004 Flexible Incentive Plan the Compensation Committee was administering "stock option[s] granted . . . shall not be less than 100% of the reported closing price of the Company's Common Stock on the NYSE on the date of grant."  *Id*. at 25.  Supporting that representation, the proposed 2004 Flexible Incentive Plan was attached to the 2004 Proxy Statement and expressly incorporated by reference.  The 2004 Flexible Incentive Plan further served to represent that the option exercise price of the stock options "determined by the committee . . . shall not be less than 100 percent (100%) of the Fair Market Value of Shares on the date of the grant."  *Id*.  This was stated in sum and substance throughout the 2004 Flexible Incentive Plan's provisions concerning stock option grants.

130.  The 2004 Proxy Statement representations were made in connection with and essential to a number of proposals HCC's Board made to the Company's shareholders for a vote.

(a)  "PROPOSAL I" concerned the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.  Each Defendant a director at the time explicitly

- 84 -

recommended approval of this proposal:  "The Board of Directors recommends that Shareholders vote 'FOR' each of the proposed nominees."

(b)     "PROPOSAL II" concerned the Company's 2004 Flexible Incentive Plan. Each Defendant a director at the time recommended HCC's shareholders approve the Plan:  "The Board of Directors recommends that Shareholders vote 'FOR' the proposal to approve the adoption of the 2004 Flexible Incentive Plan."

**Proxy Statement filed May 12, 2005**

131.     On May 12, 2005, HCC filed with the SEC its proxy statement for the 2005 annual meeting of shareholders ("2005 Proxy Statement").  The 2005 Proxy Statement was signed by Defendant Martin and reviewed and approved by Defendants Way, Martin, Bramanti, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Lack, Molbeck, Roberts and Bush.  The 2005 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Crane, Lack and Roberts.

132.     The 2005 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)     The 2005 Proxy Statement represented that the Compensation Committee "has the responsibility for assuring that the senior executives of the Company are compensated in a manner consistent with the compensation philosophy and strategy of the board and in compliance with the requirements of the regulatory bodies that oversee the Company's operations."  2005 Proxy Statement at 11-12.  The 2005 Proxy Statement also represented that the Compensation Committee "administers the Company's flexible incentive plans and other stock-based plans," and that "[n]o

Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions."  *Id.*

       (b)    The 2005 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation" of the Company's executives, including the granting of stock options.  It stated that the Compensation Committee had been using stock option awards to "reward Executive Officers and to retain them through the potential of capital gains and equity buildup in the Company," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  *Id.* at 20.  The Report of the Compensation Committee further stated that the use of "stock options represents an effective incentive to create value for the Shareholders."  *Id.*  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.

      133.    The 2005 Proxy Statement representations were made in connection with and essential to the proposal of HCC's Board concerning the vote for the election of HCC's directors – many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

**Proxy Statement filed May 11, 2006**

      134.    On May 11, 2006, HCC filed with the SEC its proxy statement for the 2006 annual meeting of shareholders ("2006 Proxy Statement").  The 2006 Proxy Statement was signed by Defendant Martin and reviewed and approved by Defendants Way, Martin, Bramanti, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Lack, Molbeck, Roberts and Bush.  The 2006 Proxy Statement also contained a "Report of the Compensation Committee" signed by Defendants Crane, Lack and Roberts.

135.    The 2006 Proxy Statement made numerous significant representations concerning HCC's stock option plans, for instance, relating to the authority of the Compensation Committee to grant stock options, the purpose of stock option grants, how stock options were being granted, and how stock options would be granted in the future.

(a)    The 2006 Proxy Statement represented that the Compensation Committee "has the responsibility for assuring that the senior executives of the Company are compensated in a manner consistent with the compensation philosophy and strategy of the board and in compliance with the requirements of the regulatory bodies that oversee the Company's operations." 2006 Proxy Statement at 11-12.  The 2006 Proxy Statement also represented that the Compensation Committee "administers the Company's flexible incentive plans and other stock-based plans," and that "[n]o Executive Officer of the Company served as a member of the Compensation Committee" or had participated in "performing equivalent functions."  *Id.*

(b)    The 2006 Proxy Statement also communicated that stock option grants were not being backdated and would not be backdated in the future.  The Report of the Compensation Committee discussed "long-term incentive compensation" of the Company's executives, including the granting of stock options.  It stated that the Compensation Committee had been using stock option awards to "reward Executive Officers and to retain them through the potential of capital gains and equity buildup in the Company," *i.e.*, by granting market value options that would compensate management by future growth in the Company's market value.  *Id*. at 20.  The Report of the Compensation Committee further stated that the use of "stock options represents an effective incentive to create value for the Shareholders."  *Id*.  Thus, stock options were not being backdated but rather were granted to incentivize the Company's management.

136.    The 2006 Proxy Statement representations were made in connection with and essential to the proposal of HCC's Board concerning the vote for the election of HCC's directors –

many of the same directors who were backdating and/or receiving backdated stock options and making misrepresentations to HCC's shareholders.

**Backdating HCC's Stock Options Falsified the Company's Financial Statements**

137.    Backdating and mispricing HCC's stock options materially falsified the Company's financial statements by causing the understatement of compensation expense, the overstatement of earnings, and the overstatement of shareholders' equity, among other things.  HCC recently restated *five years* of financial statements reported for the years ended December 31, 2001-2005, including quarterly reported financial data for each of the quarters in 2004-2005.  The Company has also stated that the periods of financial reporting affected by its restatement included quarterly reports before 2004 and annual financial statements many years back as well, at least before 1997, and that its "consolidated financial statements and related financial information contained in such previously filed reports should no longer be relied upon."  Indeed, in 1997 to 2005 alone the Company admittedly *understated* shareholders' equity by millions, and *understated* compensation expense and *overstated* income by tens of millions of dollars.  The impact on previously reported annual reported net income was as high as 7%.

138.    The reason for the extensive restatement was summed up by the Company as follows: "we determined that the price on the actual measurement dates for a number of our stock option grants during that period 1997 through 2005 and into 2006 did not correspond to the price on the stated grant date and that certain option grants were retroactively priced."  The backdated grants affected "all levels of employees."  Indeed, consistent with Plaintiffs' allegations, HCC has admitted it "used incorrect accounting measurement dates for stock option grants covering *a significant number of employees and members of [the] Board of Directors during the period 1997 through 2005* and that certain option grants were retroactively priced."  In all, millions of options were backdated in a variety of ways, the Company has admitted.

139.    For example, Way and the Compensation Committee used a "retroactive look-back period" with respect to "many block grants to employees during the period 1997-2005." In addition, the "identity" of those who would receive grants and the "number of options" they would receive "was determined" at least 30-90 days "subsequent to the stated grant date." There was also "a regular practice of granting options to newly hired employees and existing employees being promoted," which practice "included the use of [a] 30-45 day . . . look-back period during which the date with the lowest price during that period was selected as the stated grant date." "In several instances, grants to senior executives were determined at a date subsequent to the stated grant date." Options were also "granted and then repriced downward."

**Reports on Form 10-K**

140.    HCC's Reports on Form 10-K filed from 1996 (and earlier) through 2006 contained false and misleading financial statements and other statements ***understating*** compensation expense, ***overstating*** shareholders' equity, and ***overstating*** income, net income and earnings per share. They also falsely communicated that stock options were being granted in accordance with HCC's stock option plans, namely by pricing options according to the Company's stock price on the date of the grant. HCC's Reports on Form 10-K were furthermore false and misleading for stating that to the extent fair market value of the Company's stock price exceeded the option price that difference was recorded as compensation expense. These Reports on Form 10-K were false and misleading because (among other things) Defendants were backdating and mispricing stock options. As those who engaged in the backdating and received backdated options knew, many option grants were "in-the-money" and thus constituted significant unreported non-cash compensation expense.

**The Fiscal 1995 Form 10-K**

141.    On or about April 1, 1996, the Company filed its fiscal 1995 Form 10-K with the SEC. The fiscal 1995 Form 10-K was simultaneously distributed to shareholders and the public.

The fiscal 1995 Form 10-K included HCC's 1995 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

142.    The Fiscal 1995 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date. Any excess of the market price on the grant date over the exercise price is recognized as compensation expense in the accompanying consolidated financial statements." In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date. Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

143.    The Fiscal 1995 Report on Form 10-K was signed by Defendants Way, Bramanti, Smith, Collins, Dickerson, Frank, Lack, Lockwood and Wilson.

**The Fiscal 1996 Form 10-K**

144.    On or about March 31, 1997, the Company filed its fiscal 1996 Form 10-K with the SEC. The fiscal 1996 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1996 Form 10-K included HCC's 1996 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, HCC's compensation expense was understated and its net earnings were overstated.

145.    The Fiscal 1996 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date. Any excess of the market price on the grant date over

the exercise price is recognized as compensation expense in the accompanying consolidated financial statements."  In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.   Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

146.   The Fiscal 1996 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Collins, Dickerson, Frank, Lack, and Wilson.

**The Fiscal 1997 Form 10-K**

147.   On or about March 31, 1998, the Company filed its fiscal 1997 Form 10-K with the SEC.  The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1997 Form 10-K included HCC's 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

148.   The Fiscal 1997 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date.  Any excess of the market price on the grant date over the exercise price is recognized as compensation expense in the accompanying consolidated financial statements."  In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.   Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

149.   The Fiscal 1997 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Collins, Dickerson, Frank, Lack, and Wilson.

**The Fiscal 1998 Form 10-K405**

150.    On or about March 31, 1999, the Company filed its fiscal 1998 Form 10-K405 with the SEC.  The fiscal 1998 Form 10-K405 was simultaneously distributed to shareholders and the public.  The fiscal 1998 Form 10-K405 included HCC's 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

151.    The Fiscal 1998 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date.  Any excess of the market price on the grant date over the exercise price is recognized as compensation expense in the accompanying consolidated financial statements."  In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was *__higher__* than the price on the falsely stated (backdated) grant date.  Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

152.    The Fiscal 1998 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Collins, Dickerson, Ellis, Frank, Fulkerson, Lack, Molbeck, Smith and Wilson.

**The Fiscal 1999 Form 10-K**

153.    On or about March 30, 2000, the Company filed its fiscal 1999 Form 10-K with the SEC.  The 1999 Form 10-K was simultaneously distributed to shareholders and the public.  The 1999 Form 10-K included HCC's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

154.    The Fiscal 1999 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date.  Any excess of the market price on the grant date over the exercise price is recognized as compensation expense in the accompanying consolidated financial statements."  This Report on Form 10-K also attached HCC's stock option plans then in effect, which provided that stock option grants were to be priced at not less than fair market value of HCC's stock on the date of grant, and that it was the Compensation Committee that would determine and grant options.  In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.  Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

155.    The Fiscal 1999 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Bush, Collins, Crane, Dickerson, Ellis, Frank, Fulkerson, Lack and  Molbeck.

**The Fiscal 2000 Form 10-K**

156.    On or about April 2, 2001, the Company filed its fiscal 2000 Form 10-K with the SEC.  The 2000 Form 10-K was simultaneously distributed to shareholders and the public.  The 2000 Form 10-K included HCC's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

157.    The Fiscal 2000 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices, generally at the market price of the Company's Common Stock on the grant date.  Any excess of the market price on the grant date over the exercise price is recognized as compensation expense in the accompanying consolidated

financial statements."  In truth, options were backdated such that in substantially all instances HCC's stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.   Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

158.   The Fiscal 2000 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Bush, Collins, Crane, Dickerson, Ellis, Frank, Fulkerson, Lack and  Molbeck.

**The Fiscal 2001 Form 10-K**

159.   On or about April 1, 2002, the Company filed its fiscal 2001 Form 10-K with the SEC.  The 2001 Form 10-K was simultaneously distributed to shareholders and the public.  The 2001 Form 10-K included HCC's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.   As a result, HCC's compensation expense was understated and its net earnings were overstated.

160.   The Fiscal 2001 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices at the market price of our common stock on the grant date."  It was also false and misleading because it attached an employment agreement with Ellis stating the options granted Ellis "shall be granted pursuant to the Company's existing Stock Option Plans."   In truth, options (including Ellis') were backdated such that in substantially all instances HCC's stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.   Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

161.   The Fiscal 2001 Report on Form 10-K was signed by Defendants Way, Lockwood, Bramanti, Bush, Collins, Crane, Dickerson, Ellis, Flagg, Frank, Fulkerson, Lack and  Molbeck.

**The Fiscal 2002 Form 10-K**

162.    On or about March 28, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC.  The 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form 10-K included HCC's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

163.    The Fiscal 2002 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices at the market price of our common stock on the grant date.  Because of that, no stock-based employee compensation cost is reflected in our reported net income."  It was also false and misleading because it stated that the purported 1/5/00 option grant was "granted on January 5, 2000 at a per share exercise price of $12.0625 (the closing price of HCC's common stock on the NYSE on January 5, 2000)."  In truth, options (including the purported 1/5/00 grant) were backdated such that in substantially all instances HCC's stock price on the actual grant date was *higher* than the price on the falsely stated (backdated) grant date.  Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

164.    The Fiscal 2002 Report on Form 10-K was signed by Defendants Way, Bramanti, Collins, Crane, Dickerson, Ellis, Flagg, Frank, Fulkerson, Lack and Roberts.  Sarbanes-Oxley certifications associated with the Report were signed by Way and Ellis.

**The Fiscal 2003 Form 10-K**

165.    On or about March 15, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC.  The 2003 Form 10-K was simultaneously distributed to shareholders and the public.  The 2003 Form 10-K included HCC's 2003 financial statements which were materially false and

misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

166.    The Fiscal 2003 Report on Form 10-K was also false and misleading in that it stated: "All options have been granted at fixed exercise prices at the market price of our common stock on the grant date.  Because of that, no stock-based employee compensation cost is reflected in our reported net income."  In truth, options (including the purported 1/5/00 grant) were backdated such that in substantially all instances HCC's stock price on the actual grant date was ***higher*** than the price on the falsely stated (backdated) grant date.  Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.

167.    The Fiscal 2003 Report on Form 10-K was signed by Defendants Way, Bramanti, Collins, Crane, Dickerson, Ellis, Flagg, Fulkerson, Lack and Roberts.  Sarbanes-Oxley certifications associated with the Report were signed by Way and Ellis.

**The Fiscal 2004 Form 10-K**

168.    On or about March 16, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC.  The 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The 2004 Form 10-K included HCC's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.

169.    Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

170.    The Fiscal 2004 Report on Form 10-K was signed by Defendants Way, Bramanti, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Lack and Roberts.  Sarbanes-Oxley certifications associated with the Report were signed by Way and Ellis.

**The Fiscal 2005 Form 10-K**

171.    On or about March 16, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC.  The 2005 Form 10-K was simultaneously distributed to shareholders and the public.  The 2005 Form 10-K included HCC's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.

172.    Because options were backdated and mispriced to be "in-the-money" they constituted significant unreported non-cash compensation expense.  As a result, HCC's compensation expense was understated and its net earnings were overstated.

173.    The Fiscal 2005 Report on Form 10-K was signed by Defendants Way, Bramanti, Collins, Crane, Dickerson, Ellis, Flagg, Fulkerson, Lack and Roberts.  Sarbanes-Oxley certifications associated with the Report were signed by Way and Ellis.

**Reports on Form 10-Q**

174.    Defendant Way signed Reports on Form 10-Q filed by HCC on May 17, 1999, August 16, 1999, November 15, 1999, May 15, 2000, August 14, 2000, November 14, 2000, May 15, 2001, August 14, 2001, November 14, 2001, May 15, 2002, August 14, 2002, November 14, 2002, May 14, 2003, August 14, 2003, November 14, 2003, May 10, 2004, August 9, 2004, November 9, 2004, May 10, 2005, August 9, 2005, November 8, 2005 and May 10, 2006.  He also signed three Reports on Form 10-Q/A filed by HCC on March 2, 2004.  And Way signed Sarbanes-Oxley certifications for the three Reports on Form 10-Q/A filed by HCC on March 2, 2004, as well as those for the Reports on Form 10-Q filed by HCC on November 14, 2002, May 14, 2003, August

14, 2003, November 14, 2003, May 10, 2004, August 9, 2004, November 9, 2004, May 10, 2005, August 9, 2005, November 8, 2005 and May 10, 2006.  The reports identified contained the Company's interim unaudited financial statements, which were false and misleading for *understating* compensation expense and *overstating* income, net income and earnings per share. These Reports on Form 10-Q were false and misleading because (among other things) Defendants were backdating and mispricing stock options.  Certain of those reports also contained affirmative statements concerning stock option grants similar to those statements made in the Reports on Form 10-K for the same fiscal year, such as:  "All options have been granted at fixed exercise prices at the market price of our common stock on the grant date.  Because of that, no stock-based employee compensation cost is reflected in our reported net income."  Those statements too, were false and misleading.  As Way knew, option grants were being backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

175.    Defendant Ellis signed Reports on Form 10-Q filed by HCC on November 11, 1997, May 15, 1998, August 14, 1998, November 16, 1998, May 17, 1999, August 16, 1999, November 15, 1999, May 15, 2000, August 14, 2000, November 14, 2000, May 15, 2001, August 14, 2001, November 14, 2001, May 15, 2002, August 14, 2002, November 14, 2002, May 14, 2003, August 14, 2003, November 14, 2003, May 10, 2004, August 9, 2004, November 9, 2004, May 10, 2005, August 9, 2005, November 8, 2005 and May 10, 2006.  He also signed two Reports on Form 10-Q/A filed by HCC on March 27, 1998, and three Reports on Form 10-Q/A filed by HCC on March 2, 2004.  And Ellis signed Sarbanes-Oxley certifications for the Reports on Form 10-Q/A filed by HCC on  March 2, 2004, as well as for the Reports on Form 10-Q filed by HCC on November 14, 2002, May 14, 2003, August 14, 2003, November 14, 2003, May 10, 2004, August 9, 2004, November 9, 2004, May 10, 2005, August 9, 2005, November 8, 2005 and May 10, 2006.  The reports identified contained the Company's interim unaudited financial statements, which were false and misleading

for *understating* compensation expense and *overstating* income, net income and earnings per share. These Reports on Form 10-Q were false and misleading because (among other things) Defendants were backdating and mispricing stock options.  Certain of those reports also contained affirmative statements concerning stock option grants similar to those statements made in the Reports on Form 10-K for the same fiscal year, such as:  "All options have been granted at fixed exercise prices at the market price of our common stock on the grant date.  Because of that, no stock-based employee compensation cost is reflected in our reported net income."  Those statements too, were false and misleading.  As Ellis knew, option grants were being backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

176.    Defendant Molbeck signed Reports on Form 10-Q filed by HCC on May 15, 1998, August 14, 1998 and November 16, 1998.  The reports identified contained the Company's interim unaudited financial statements, which were false and misleading for *understating* compensation expense and *overstating* income, net income and earnings per share.  These Reports on Form 10-Q were false and misleading because (among other things) Defendants were backdating and mispricing stock options.  As Molbeck knew, option grants were being backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

177.    Defendant Bramanti signed Reports on Form 10-Q filed by HCC on May 15, 1996, August 14, 1996, November 14, 1996, May 15, 1997, August 14, 1997 and November 14, 1997, and two Reports on Form 10-Q/A filed by HCC on March 27, 1998.  The reports identified contained the Company's interim unaudited financial statements, which were false and misleading for *understating* compensation expense and *overstating* income, net income and earnings per share. These Reports on Form 10-Q were false and misleading because (among other things) Defendants were backdating and mispricing stock options.  As Bramanti knew, option grants were being

backdated to be "in-the-money" and thus constituted significant unreported non-cash compensation expense.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

178.    The 1995-2006 Proxy Statements and periodic reports concealed Defendants' option backdating scheme.    Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1995 and 2006.    In fact, it was not until August 2006 that shareholders learned the Company's SEC filings which they had relied upon for years were false and misleading.    Defendants have been unjustly enriched at the expense of HCC, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

179.    On August 14, 2006, HCC filed a Form 8-K with the SEC announcing an independent internal review of the Company's historical stock option granting practices.

180.    On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock option review had not been completed.    Then, on November 17, 2006, HCC filed a Form 8-K with the SEC, stating the Company had used incorrect measurement dates for certain stock option grants.

181.    At that time, the Company disclosed that its "Special Committee" had made its "determinations as a result of its review of [HCC's] past stock option granting processes."    The "Special Committee" is composed of Defendants Flagg, Collins and Duer, each of which has received backdated stock options, and one of whom, Collins, engaged in backdating for years while working on the Company's Compensation Committee.    The Special Committee, like HCC's Board, is severely disabled, and it has demonstrated its inability to properly and fully investigate the Company's backdating by failing to take any action whatsoever with respect to the conduct of Compensation Committee members who engaged in backdating repeatedly for years.    Indeed, while

admitting to extensive backdating over a 10-year period, the Company has not disputed that the Compensation Committee engaged in wrongful conduct.

182.    In an apparent attempt to excuse the Special Committee from being ineffectual, HCC stated in connection with its restatement that before the Board reviewed the results of the Special Committee's "investigation" the Chairman of the Compensation Committee, Defendant Lack (who oversaw the extensive backdating while he worked on the Compensation Committee during 1999-2006) "tendered his resignation from the Board of Directors." Of course, Lack was not the only one who engaged in backdating, and his resignation does not excuse the Special Committee from not taking action, nor does it excuse the Board from its silence concerning the conduct of the Compensation Committee and other Board members.

## SOME ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

183.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of HCC, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

184.    The Defendants' wrongful course of conduct by engaging in, authorizing and/or acquiescing in the stock options backdating has caused HCC to improperly divert hundreds of millions of dollars of corporate assets to HCC's senior executives and directors. The backdating also resulted in HCC filing materially false and misleading statements with the SEC. As a result of the improper backdating of stock options, the Company and certain of the Company's officers and directors, with the knowledge of each of the Defendants:

(a)    backdated and mispriced stock option grants;

(b)    signed and otherwise authorized the filing of false and misleading Reports on Form 10-K and 10-Q, Proxy Statements and Sarbanes-Oxley certifications;

(c)     violated the terms of the Company's stock option plans;

(d)     violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

(e)     violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals; and

(f)     produced and disseminated to HCC shareholders false and misleading financial statements that understated compensation expense and overstated shareholders' equity and income, net income, and earnings per share.

185.    As a result of these improprieties, the Company will need to expend significant sums of money including the following:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     costs incurred from responding to subpoenas and requests for information from government agencies including the SEC and DOJ;

(c)     costs incurred from potential fines in connection with governmental investigations;

(d)     costs incurred from increased Directors and Officers Insurance ("D&O" Insurance) premiums as a result of the illegally manipulated stock option grants;

(e)     costs incurred from directing manpower to correct HCC defective internal controls;

(f)     costs incurred from directing personnel to engage in work to restate HCC's prior financial results to correct for the improperly-dated stock option grants; and

(g)     costs incurred to offset the harm to HCC caused by the fall in market value of the Company's stock resulting, in whole or in part, from disclosures of stock-option backdating

investigations by the SEC, the U.S. Department of Justice, IRS or other governmental regulatory entities.

## TOLLING OF THE STATUTE OF LIMITATIONS

186.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading SEC filings, by falsely reassuring HCC's public investors that HCC's option grants were being administered by a committee of independent directors and were priced at fair market value on the ate of the grant, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

187.    Indeed, Defendants took affirmative steps to conceal the backdating at HCC by authorizing or otherwise causing the Company to issue Proxies, Form 3s, Form 4s, Form 5s, Form 10 Qs, Form 10 Ks, and other SEC filings and public statements that were false and misleading. These SEC filings omitted the true grant date and proper price for backdated options, and failed to disclose options were being backdated and mispriced.  Many of these SEC filings also contained affirmative misrepresentations that stock options were being priced at fair market value as of the date of the grant and were otherwise determined and granted in accordance with HCC's stock option plans.  These false and misleading SEC filings prevented Plaintiffs and HCC's public shareholders from becoming aware of the backdating practices at HCC and HCC's false and misleading financial statements.

188.    Other earmarks of Defendants' concealment include the admitted lack of timely or adequate documentation in connection with stock option grants.  The Company has also admitted

that its former General Counsel, Defendant Martin, did not "properly document" conduct between the Compensation Committee and Way in connection with stock option grants. HCC has further admitted that Way "should have known" the stock option backdating "conflicted with [HCC's] stock option plans and public statements."

189.   HCC's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until August 2006 when the Company announced it had initiated an internal review of its stock option grant practices. On October 30, 2006, HCC filed a Form 8-K with the SEC announcing the Company would be unable to file its Form 10-Q for the fiscal year ended June 30, 2006, advising that the stock option review had not been completed. Then, on November 17, 2006, the Company announced the results of its independent investigation of the Company's historical stock option granting practices:

> HCC Insurance Holdings, Inc. announced today the results of the Company's independent investigation of its historical stock option granting practices and certain changes in its executive management.
>
> The Company has substantially completed its previously announced independent investigation of the Company's stock option granting practices during the period of 1995 through the present. This comprehensive investigation was conducted by members of the Audit Committee, acting as an independent special committee of the Board of Directors (the "Special Committee"), with the assistance of Skadden, Arps, Slate, Meagher & Flom, LLP as independent legal counsel to the Special Committee and LECG as forensic accountants.
>
> The investigation has concluded that the Company used incorrect measurement dates for certain stock option grants covering a significant number of employees during the period from 1995 through 2006. The Company and the Special Committee are working with their advisors to determine the appropriate measurement dates and assess the related financial effects. LECG currently estimates the cumulative pre-tax financial impact of recording additional non-cash charges associated with stock option grants is not likely to exceed $37 million spread over the vesting periods of the options in question. The Company expects that the errors will require some increased tax provision. The Company is currently evaluating LECG's estimate for the financial impact and the related tax impact. Upon completion of this evaluation, the Company will determine whether a restatement of certain previously filed financial statements will be required.

The Company intends to continue cooperating with the SEC in connection with its informal inquiry into this matter.

190.    Finally, as fiduciaries of HCC and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from HCC's public shareholders the facts that give rise to the claims asserted herein, *i.e.,* that the HCC Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### the Director Defendants and Martin

191.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

192.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

193.    The 1995-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing HCC to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1995.

194.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

195.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiffs in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's undisclosed backdating.

196.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting Against All Defendants

197.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

198.    At all relevant times, Defendants, as directors and/or officers of HCC, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

199.    In breach of their fiduciary duties owed to HCC and its shareholders, the Defendants caused HCC, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of HCC and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the Defendants breached their fiduciary duties owed to HCC and its shareholders.

200.    The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

201.     As a result of Defendants' misconduct, HCC has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

202.     Plaintiffs demand an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

### COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

203.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

204.     Each of the Defendants agreed to and did participate with Way and Bramanti and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

205.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to HCC and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of HCC and its shareholders.

206.     As alleged herein, Defendants who were and/or still are officers at HCC breached their fiduciary duties by (among other things):

(a)     colluding with Way Compensation Committee directors to backdate stock option grants;

(b)      signing and/or otherwise authorizing materially false and misleading SEC filings disseminated to HCC shareholders that improperly recorded and accounted for backdated stock option grants and concealed the backdating of stock options;

(c)      signing and/or otherwise authorizing materially false and misleading Proxy statements and Form 4 filings to conceal the backdating of stock options at HCC; and/or

(d)      exercising backdated stock options to unjustly reap excessive compensation from insider selling proceeds.

207.    As alleged herein, the Defendants who were and/or still are directors of HCC breached their fiduciary duties by (among other things):

(a)      backdating stock option grants and colluding with Way to backdate stock option grants;

(b)      causing the Company to violate GAAP and file materially false and misleading financial statements and colluding with Way to do the same;

(c)      signing and/or otherwise authorizing materially false and misleading SEC filings that improperly recorded and accounted for the backdated stock option grants and concealed the backdating of stock options;

(d)      signing and/or otherwise authorizing materially false and misleading Proxy statements and Form 4 filings to conceal the backdating of stock options; and/or

(e)      exercising backdated stock options to unjustly reap excessive compensation from insider selling proceeds.

208.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to HCC and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

209.   By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward HCC and its public shareholders.

210.   As a proximate result of Defendants' conduct, in concert with Way and Bramanti, HCC has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

211.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

212.   The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, HCC, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at HCC.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding HCC.

213.   Defendants' conduct constituted an abuse of their ability to control and influence HCC.

214.   By reason of the foregoing, HCC has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

215.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

216.   Defendants had a duty to HCC and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of HCC.

217.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of HCC in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of HCC's affairs and in the use and preservation of HCC's assets.

218.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused HCC to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to HCC, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged HCC.

219.    By reason of the foregoing, HCC has been damaged.

### COUNT VI

### Constructive Fraud Against All Defendants

220.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

221.    As corporate fiduciaries, Defendants owed to HCC and its shareholders a duty of candor and full accurate disclosure regarding the true state of HCC's business and assets and their conduct with regard thereto.

222.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from HCC's shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship of HCC.  Thus they have committed constructive fraud and violated their duty of candor.

223.    By reason of the foregoing, HCC has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

224.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

225.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused HCC to waste valuable corporate assets.

226.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All  Defendants

227.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

228.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of HCC, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

229.    All the payments and benefits provided to the Defendants were at the expense of HCC.  The Company received no benefit from these payments.  HCC was damaged by such payments.

230.    Certain of the Defendants sold HCC stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of HCC.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Rescission Against All Defendants

231.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

232.    As a result of the acts alleged herein, the stock option contracts between the Defendants and HCC entered into during the relevant period were obtained through Defendants' fraud, deceit, and/or abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly-filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by HCC shareholders and filed with the SEC.

233.    All contracts which provide for stock option grants between the Officer Defendants and HCC and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

234.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

235.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold HCC common stock on the basis of such information.

236.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold HCC common stock.

237.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of HCC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

238.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**COUNT XI**

**Derivative Claims Against Defendants Way and Ellis
for Disgorgement Under the Sarbanes-Oxley Act of 2002**

239.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

240.   Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company makes an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

1.   Additional compensation prior to noncompliance with commission financial reporting requirements.  If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for

a.   any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

- 113 -

      b.      any profits realized from the sale of securities of the issuer during that 12-month period.

2.      Commission exemption authority. The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

241.    HCC has restated financial statements due to material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002. As a result, Defendant Way, as HCC's CEO, and Defendant Ellis, as HCC's CFO, are required to reimburse HCC for all bonuses, incentive-based, and equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of Sarbanes-Oxley Act of 2002) through the present.

242.    Further, Defendants Way and Ellis are also liable to HCC for any profits realized from the sales of securities by the Company during the same period of time.

243.    Defendants Way and Ellis are also liable to Plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of HCC.

**COUNT XII**

**Against Defendants Way, Bramanti, Bush, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Kelbel, Martin, Molbeck, Roberts, Lockwood, Nagji, Smith, Frank, Lack, Wilcox and Wilson for Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

244.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

245.    Between at least 1996 and the present, Defendants Way, Bramanti, Bush, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Martin, Molbeck, Roberts, Lockwood, Smith, Frank, Lack and Wilson signed and/or otherwise approved SEC filings that did not disclose the backdating practices that were occurring at HCC and the resulting affects of those practices on the Company's financial results. Specifically, HCC's financial statements, as identified above, included

financial results that did not properly account for stock options that were granted below fair market value.  Defendants Way, Bramanti, Bush, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Martin, Molbeck, Roberts, Lockwood, Smith, Frank, Lack and Wilson knew or severely recklessly disregarded the fact that the Company's financial statements were misleading – due to the backdating – in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

246.    At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and these Defendants were insider selling their stock into the market, Defendants Way, Bramanti, Bush, Collins, Crane, Dickerson, Duer, Ellis, Flagg, Fulkerson, Kelbel, Martin, Nagji, Molbeck, Roberts, Lockwood, Smith, Frank, Lack, Wilcox and Wilson were causing HCC to repurchase its own stock on the open market at inflated prices from August 2004 through the present.  Thus, Defendants violated §10b of the Exchange Act and Rule 10b-5 in that they:

a.      Employed devices, schemes and artifices to defraud;

b.      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon HCC and others in connection with their purchases of HCC common stock during the relevant period.

247.    As a result of the misconduct by the Defendants named in this Count, HCC has suffered and will suffer damages in that it paid artificially inflated prices for HCC common stock purchased on the open market.  HCC would not have purchased HCC common stock at the prices it paid had the market previously been aware that the market prices of HCC's stock was artificially inflated and falsely inflated by Defendants' misleading statements.  As a direct and proximate result

of these Defendants' wrongful conduct, HCC suffered damages in connection with its purchases of HCC common stock.  By reason of such conduct, the Defendants named in this Count are liable to the Company pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT XIII**

**Against All Defendants for Violations of §20(a) of the Exchange Act**

248.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

249.    Defendants, by virtue of their positions with HCC and their specific acts were, at the time of the wrongs alleged herein, controlling persons of HCC within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause HCC to engage in the illegal conduct and practices complained of herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing HCC to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)      a proposal requiring that the office of CEO of HCC and Chairman of the HCC Board of Directors be permanently held by separate individuals and that the Chairman of the HCC Board meets rigorous "independent" standards;

(ii)      a proposal to strengthen the HCC Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)      appropriately test and then strengthen the internal audit and control function;

(iv)      rotate independent auditing firms every five years;

(v)      control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)      reform executive compensation.

D.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.      As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the

exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

   H.  Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

   I.  Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

   Plaintiffs demand a trial by jury.

DATED:  May 23, 2007     CROWLEY DOUGLAS & NORMAN, LLP
                TIMOTHY J. CROWLEY (05170700)
                RICHARD E. NORMAN (00788128)


                   s/ Richard E. Norman
                 RICHARD E. NORMAN

                1301 McKinney Street, Suite 3500
                Houston, TX  77010-3034
                Telephone:  713/651-1771
                713/651-1775 (fax)

                HAGANS BURDINE MONTGOMERY RUSTAY
                 & WINCHESTER, P.C.
                WILLIAM FRED HAGANS (08685500)
                JENNIFER B. RUSTAY (24002124)
                3200 Travis, Fourth Floor
                Houston, TX  77006
                Telephone:  713/222-2700
                713/547-4950 (fax)

                Co-Liaison Counsel

                LERACH COUGHLIN STOIA GELLER
                 RUDMAN & ROBBINS LLP
                TRAVIS E. DOWNS III
                JAMES I. JACONETTE
                BENNY C. GOODMAN III
                MARY LYNNE CALKINS
                655 West Broadway, Suite 1900
                San Diego, CA  92101-3301
                Telephone:  619/231-1058
                619/231-7423 (fax)

- 118 -

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
MONIQUE C. WINKLER
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
THOMAS G. WILHELM
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
121 N. Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-2677
610/225-2678 (fax)

Co-Lead Counsel for Plaintiffs

CAULEY, BOWMAN, CARNEY
  & WILLIAMS, LLP
J. ALLEN CARNEY
DARRIN WILLIAMS
MARCUS N. BOZEMAN
11311 Arcade Drive, Suite 200
Little Rock, AR  72212
Telephone:  501/312-8500
501/312-8505 (fax)

Counsel for Plaintiffs

S:\CptDraft\Derivative\cpt hcc consolidated.doc

- 119 -

## HCC INSURANCE HOLDINGS, INC. VERIFICATION

I, James I. Jaconette, hereby verify that I am familiar with the allegations in the Consolidated

Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Complaint,

and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED:  __5/23/07__

__JAMES I. JACONETTE__

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 23, 2007.

s/ Richard E. Norman
RICHARD E. NORMAN

CROWLEY DOUGLAS & NORMAN, LLP
1301 McKinney Street, Suite 3500
Houston, TX  77010-3034
Telephone:  713/651-1771
713/651-1775 (fax)